Felice GRILLEA, Appellant,

v.

UNITED STATES of America and National Shipping Authority, Appellees.

No. 120, Docket 23609.

United States Court of Appeals Second Circuit.

Argued Dec. 9, 1955.

Decided Jan. 30, 1956.

Judgment Reversed on Rehearing April 26, 1956.

688

Robert Klonsky, New York City, Herman E. Hoberman, Brooklyn, N. Y., Klonsky & Steinman, New York City, of counsel, for appellant.

Thomas F. Feeney, Brooklyn, N. Y., Paul W. Williams, U. S. Atty., Kirlin, Campbell & Keating, Counsel to U. S. Atty., New York City, Joseph M. Cunningham, Bronxville, N. Y., Vernon S. Jones, New York City, of counsel, for appellees.

Before HAND, SWAN and FRANK, Circuit Judges.

HAND, Circuit Judge.

This is an appeal from a decree in a suit under the Suits in Admiralty Act,[1] dismissing the libel of a longshoreman, who was injured by a fall through an open hatch, while working on board a ship, owned by the United States, but chartered to the Moore-McCormack Lines, Inc. The suit was based upon the unseaworthiness of the ship by reason of undisputed facts, for which, however, Judge Ryan held that the respondent was not liable, although he assessed the damages at $55,000 against the possibility of a reversal—incidentally, a most desirable practice. The accident happened as follows. The hatch covers for No. 5 upper tweendecks of the ship had been taken off by a gang of longshoremen on the afternoon of September 18, 1951, and had been stowed in piles alongside the side of the hatch; they were each five feet long and twenty-two inches wide. The hatch was divided into three sections by two "kingbeams" about twenty feet long, running athwartships, and resting upon flanges at the edges of the hatch. These beams were five feet apart, so that the covers spanned the distance between them, resting upon flanges along the edges of the beams. In the center of each of the three sections, so formed, ran another beam—a "queenbeam"—also athwartships, to support the center of the covers, presumably against the stowage of exceptionally heavy cargo. Thus each section was divided into two slits or channels, not quite two and one half feet wide. On the day in question, owing to a defect in one of the "queenbeams" it had not been placed in the middle section, so that that section was an open space about five feet wide. The other two "queenbeams" were in position and on the 19th the gang of longshoremen, of whom the libellant was one, had replaced all the covers on the forward section and several starboard covers on the after section. The libellant and a fellow longshoreman had also placed one or two starboard covers on the middle section, and were placing the next cover of the middle section alongside it. The libellant was carrying the forward end of this cover by a hook, and to set it in place he had to step upon one of the covers already laid in the after section. As he did so, that cover rocked or swayed and threw him off his balance, so that he fell between the "kingbeams" of the middle section to the deck below. Although the cover did not slip from the flange of the "kingbeam" or of the hatch, as it crossed the "queenbeam" in the aftersection, it rested upon a protuberance, called a "pad-eye," on the top of the "queenbeam," and did not therefore lie flat upon the flange of the "kingbeam." There had been one cover in the pile with a recess, or "cut-out" to fit over the "pad-

1. § 742, Title 46, U.S.C.A.

eye," but the longshoremen had not selected that particular cover for that place, but another that had no "cut-out." They had failed to do so because they assumed that the covers had been undisturbed over night after they had been taken off and piled on the 18th, and it was the usual practice when recovering a hatch to put back the covers in the order in which they were piled. During the night a gang of cleaners, also in the charterer's employ, had taken down the pile, and in repiling the covers had not put them back in the same order, and the libellant and his companion did not notice that the right cover was not placed over the "pad-eye." The libellant's claim of unseaworthiness was twofold: (1) the absence of the "queenbeam" from the middle section; and (2) the wrong cover placed over the "pad-eye" of the "queenbeam" in the after section. Judge Ryan held that the libellant had failed to show that the absence of the "queenbeam" in the middle section had contributed to the libellant's fall; and (2) that the respondent, having demised the ship, was not liable for any unseaworthiness that resulted from placing the wrong cover over the "pad-eye" after the ship had been delivered. These are the only questions that we need consider.

■ First, as to the absence of the "queenbeam" from the middle section. The reason for this was concededly that the "queenbeam" was defective, and, if its absence contributed to the libellant's fall, the respondent is liable, this being a defect in the ship's gear, for a demisor is liable for unseaworthiness of the hull or gear, existing when the demise is made.[2] Moreover, the owner always has the burden of proving that the ship is seaworthy when delivered, and we will assume, *arguendo*, that the respondent had the burden of proving that she remained so after delivery, though that is indeed open to much question. However, as the "queenbeam" was certainly defec-

tive, the burden of proof as to the ship's fitness need not concern us. On the other hand, the libellant, not the respondent had the burden of proving that the unseaworthiness was one of the causes of the libellant's fall.[3] Judge Ryan found that the "queenbeam" would not have stopped it, and that is a finding of fact in strictest sense, which we should therefore accept unless it was "clearly erroneous." We do not see how it can be seriously argued that the "queenbeam" would certainly have saved the libellant. There would still have been a space of over two feet through which his body could easily have passed; and while it is true that he might have caught hold of the beam as he fell, how can we say that he would have succeeded? If, for instance, his back had been to the middle section when he lost his footing, it would have been impossible for him to catch hold of the beam. Indeed, how can we say with any show of assurance what would have happened, however he faced? Had the burden of proof been on the respondent to prove that the beam, if in place, would not have saved the libellant, a finding that it would not have might be open to reversal; but a finding that the libellant failed to prove that it would have was certainly reasonable.

■ There remains the question whether the respondent is liable because of the unseaworthiness of the hatch cover, placed where it was after the ship had been delivered upon a demise. That it would have been liable only if the ship had been unfit, when delivered to the demisee, we held in Cannella v. Lykes S. S. Co., supra, 174 F.2d 794, and we adhere to that ruling, so that the issue depends upon whether the charter was a demise. The only reasons urged by the libellant why it was not, were that it limited the ship's operation to "Trade Route 1," and reserved to the owner the power to remove "the Master or Chief Engineer * * * if it shall have reason to be dissatisfied with his conduct, or if it con-

---

**2.** Cannella v. Lykes Bros. S. S. Co., 2 Cir., 174 F.2d 794.

**3.** Grillo v. United States, 2 Cir., 177 F.2d 904; Manhat v. United States, 2 Cir., 220 F.2d 143.

siders his employment to be prejudicial to the interests of the United States." However, if either of these officers was removed, the charterer alone could appoint the new master or engineer, so that the management of the ship's affairs was always to be within the complete control of the charterer's employees. The limit upon the ship's trading limits was certainly irrelevant,[4] and the same appears to us to be true of the power of removal. The transfer of liability by reason of a demise can have for its rational basis only the owner's absence of power to keep the ship seaworthy. It is of course true that by a succession of removals the owner might be able in the end to procure a master or an engineer who would be amenable to his directions; that was not the purpose of the provision, and a series of removals with that in view would have been a plain abuse of the power. While the master or the engineer held his office he was subject to the orders of the charterer quite as much as though the respondent had had no power to remove him. While we have been unable to find that the point has ever been passed upon, over and over again the test has been whether the charterer either can immediately dictate the details of an employee's service, or by contract can prescribe in advance what those whom he may employ, such as stevedores or the like, shall perform.[5] In the case of harbor scows and the like, even the presence of a bargee on board, as a caretaker, does not prevent the charter from being a demise.[6] The distinction is neither thin nor unreasonable that an owner shall be liable, as in Petterson v. Alaska S. S. Co., 9 Cir., 205 F.2d 478, affirmed 347 U.S. 396, 74 S.C. 601, 98 L.Ed. 798, for defective gear brought on board by a stevedore, but shall not be for unseaworthiness, developing while a demisee is operating the ship. In the first situation the owner has chosen the stevedore and ordinarily has his own officers on board to oversee what goes on; in the second, he has turned over all management to the demisee. Even under a system of compensation regardless of fault—which we should welcome—the question would still remain whether the liability ought to extend beyond the demisee, on whose initiative and for whose profit the venture had been undertaken, and should also include the demisor, who has done no more than put the demisee into possession of the ship, just as those would have done who should provide him with any other means appropriate to his undertaking. Once it is settled that the ship on delivery is well found in hull and gear, we can see no *a priori* reason why recovery should not be limited to the demisee.[7]

We do not consider the question whether, aside from any personal liability of the demisee, a maritime lien was imposed upon the demised ship because of unseaworthiness occurring after the demise,[8] for neither in his libel nor at any other time did the libellant elect that the suit "shall proceed in accordance with the principles of a libel in rem." We held in Schnell v. United States, supra, 166 F.2d 479, that the failure so to elect in the libel was decisive though the libellant attempted to amend at the trial. In the case at bar, not only, as we have just said, has he made no such suggestion at any time, but more than two years have passed since the libel was filed.

Decree affirmed.

4. Schnell v. United States, 2 Cir., 166 F. 2d 479, 480.

5. Reed v. United States, 11 Wall. 591, 601, 20 L.Ed. 220; Leary v. United States, 14 Wall. 607, 610, 20 L.Ed. 756; United States v. Shea, 152 U.S. 178, 186, 187, 14 S.Ct. 519, 38 L.Ed. 403; The South Coast, 251 U.S. 519, 40 S.Ct. 233, 64 L.Ed. 386; Baumvoll Mfg. Co. v. Gilchrest & Co., L.R. (1891) 1 Q.B. 253, 257.

6. The Willie, 2 Cir., 231 F. 865; The Harper, No. 145, 2 Cir., 42 F.2d 161.

7. Poignant v. United States, 2 Cir., 225 F.2d 595, 597.

8. The Harper No. 145, 2 Cir., 42 F.2d 161; The Sundial, 2 Cir., 43 F.2d 700.