Marie A. DIMAS, as Administratrix of the goods, chattels and credits of Joseph Dimas, deceased, Plaintiff-Appellant,

v.

LEHIGH VALLEY RAILROAD COMPANY, Defendant-Appellee.

Jose LUACES, Plaintiff-Appellant,

v.

LEHIGH VALLEY RAILROAD COMPANY, Defendant-Appellee.

No. 298, Docket 23938.

United States Court of Appeals Second Circuit.

Argued April 3 and 4, 1956.

Decided May 24, 1956.

Gay & Behrens, New York City, Edward J. Behrens and George Halpern, New York City, of counsel, for appellant Dimas.

Richard M. Cantor, New York City, for appellant Luaces.

Alexander & Green, New York City (William R. McDermott, New York City, of counsel), for appellee.

Before FRANK, MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

These are consolidated actions, based on diversity, but governed by maritime law,[1] to recover damages for personal injuries to plaintiff Luaces and for the death of Joseph Dimas, plaintiff Dimas' intestate. The court directed the jury to return a verdict for the defendant, and plaintiffs appeal.

The damages complained of arose out of an explosion of the boiler of the Captain C. Mathiasen, a tug on which Luaces and Dimas were employed as firemen. At the time of the accident, March 24, 1948, the vessel was owned by Mathiasen Transportation Co., Inc. and in the pos-

---

1. Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

session and under the control of Mathiasen Shipping Co., Inc., the employer of Luaces and Dimas and, apparently, an affiliate of Mathiasen Transportation Co., Inc.

Defendant, the Lehigh Valley Railroad Company (hereinafter called "Lehigh") is a prior owner of the tug, having purchased it in 1924 when it was five years old. From 1924 until 1944, Lehigh owned and, for most of that period, operated the tug, then called the Niagara. In December 1944,[2] Lehigh sold the tug "as is" and "subject to complete inspection" of Mathiasen Transportation Co., Inc., the bill of sale providing, in part, that Lehigh "does not hereby warrant the seaworthiness or the condition" of the vessel or its appurtenances.

The tug's boiler was of a type called Scotch Marine, a large cylindrical outer shell, inside which were three furnaces, a combustion chamber common to all three furnaces and, located between them and the inner shell, a cylinder 10 inches smaller in diameter than the outer shell to which it was fastened by staybolts. The rear of the inner shell is known as a flame sheet and its sides, which were riveted to the flame sheet, are known as the wrapper sheet; the shell surface toward the furnace is called the fire side; that toward the outer shell is called the water side.

At the trial, Luaces, who had been employed as fireman on the Captain C. Mathiasen for some years prior to the explosion and, before that, for a short time on the same tug while it was the Niagara, testified that while in the combustion chamber or "back connection" he observed that "two big welding jobs" had been done on the wrapper sheet at the bottom of the "back connection." As fireman, it was part of his job to clean the combustion chamber, to remove the ashes, scrape when necessary, and so forth. He testified that while shoveling out ashes—both when the tug was the Niagara and when it was the Captain C. Mathiasen—he noticed that the ashes were wet. He said nothing about it to his superior or anyone else, although he knew that wet ashes signified a leak.

Plaintiff Mrs. Marinello, formerly Mrs. Dimas and the widow of Joseph Dimas, deceased, testified that Joseph Dimas had commented to her with respect to the tug that "more repair could be made," that when it was put in for repairs, "it wasn't in the shop long enough at times," and that he had "often made the remark that some day it might blow up."

Plaintiffs also called as a witness Francis J. Swan, a commander in the Coast Guard connected with marine inspection, for the sole purpose of laying a foundation for the entire Coast Guard investigation file on the explosion, which was offered in evidence. Included in this file were two reports:[3] The first of these, in point of time, hereinafter referred to as the "Board Report," is addressed to the Commandant of Merchant Vessel In-

2. According to Coast Guard records the sale and transfer of possession did not occur until January 1945.

3. When the file was first offered, the attorney for defendant objected to the admission of the first described report on the ground that it had been reversed by the reviewing board. The court apparently agreed, but because counsel were unable to agree on the extent of the differences between the two reports, the court took them under advisement. Later, the court suggested that the attorneys get together after court recessed and "agree on * * * what is overruled, what is in the commandant's, so there will be no problem of what is admissible and what is not admissible * * *." When court reconvened, plaintiffs' exhibit 3 (the record of proceedings of the board of investigation), exhibit 4 (the report of board of investigation) and exhibit 5 (the report of the review board) were admitted in evidence after the attorney for the defendant stated as follows: "I make no objection on the ground that they are not documents made in the regular course of business of the Coast Guard and that they as such would be admissible. I do make an objection, however, upon the ground that they are neither material nor relevant * * *."

spection and sets forth the "Findings of Fact," "Conclusions" and "Recommendations" of the Board, based on interviews with the witnesses listed in the report. The second, hereinafter referred to as the "Commandant's Report," is from the Commandant to Commander Malony, Chairman of the investigatory board, whose report it reviews, approving it in part and reversing it in part. Plaintiff also introduced into evidence Marine Engineering Regulation Section 52.01–65 requiring that prior approval for any repair or replacement be obtained and that such repair or replacement "shall so far as practicable be made with materials and in the manner specified for new construction."[4] Largely on the basis of this Regulation and the Board Report, which will be discussed in detail below, plaintiffs contend that they have made out a case for the jury on the theories of unseaworthiness, of negligence and of nuisance.

Until the decision in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, the prevailing view was that liability for unseaworthiness was an incident of contract, see e. g., Hamilton v. United States, 4 Cir., 268 F. 15, certiorari denied 254 U.S. 645, 41 S.Ct. 15, 65 L. Ed. 454; Rainey v. New York & P. S. S. Co., 9 Cir., 216 F. 449, certiorari denied sub nom. Rainey v. W. R. Grace & Co., 235 U.S. 704, 35 S.Ct. 209, 59 L.Ed. 433, and imposed on the shipowner only while he was in control of his vessel, In re New York Dock Co., 2 Cir., 61 F.2d 777, and only in favor of seamen employed by him. See Benedict, Admiralty, page 260 (6 Ed. 1940). Seas Shipping Co. v. Sieracki, supra [328 U.S. 85, 66 S.Ct. 877], rejecting as the basis of liability not only contract, but negligence as well, established that liability for unseaworthiness "is essentially a species of liability without fault." That case also enlarged the class of persons within the protection of the doctrine of unseaworthiness to include employees of an independent contractor performing what has traditionally been considered "ship's work." And, in this circuit, the Sieracki decision has also resulted in an enlargement of the class subject to liability: in Cannella v. Lykes Bros. S.S. Co., 2 Cir., 174 F.2d 794, certiorari denied 338 U.S. 859, 70 S. Ct. 102, 94 L.Ed. 526, we held that the owner of a vessel demised under a bareboat charter was subject to liability for unseaworthiness existing at the time of the demise. Compare Vitozi v. Balboa Shipping Co., Inc., 1 Cir., 163 F.2d 286 and also Muscelli v. Frederick Starr Contracting Co., 296 N.Y. 330, 73 N.E.2d 536.

Plaintiffs argue that Cannella v. Lykes S.S. Co., Inc., supra, is squarely apposite to the case before us, there being no substantial difference between an owner not in control, such as Lykes S.S. Co., and a former owner, such as Lehigh, adding "parenthetically" that this elimination of the element of control brings liability for unseaworthiness into line with that for negligence under MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696. Cannella v. Lykes S.S. Co., however, rested on the authority of Sieracki, which, as we read it, is far from suggesting that present ownership, as of the time of the accident, is no longer to be a material fact; rather its clear premise is that there exists the traditional three-cornered relationship of master, vessel, and ship-worker, upon which responsibility is predicated. In other words, we cannot find in Sieracki, even by implication, any authority for taking the step plaintiffs urge, which would impose absolute liability on a party who at the time of the accident had no relation whatever to the vessel or to the injured ship-worker.

■ And while MacPherson v. Buick Motor Co., supra, has enjoyed wide approbation, of this court as of others, see Fredericks v. American Export Lines, 2 Cir., 227 F.2d 450, it may well be unwise to make the alignment plaintiffs urge

---

**4.** Defendant's case consisted of proof of the sale "as is" and annual inspection records of the Coast Guard.

since unlike liability for negligence which is based on fault, liability for unseaworthiness is absolute and imposed regardless of fault. But cf. concurring opinion in Cannella v. Lykes, supra, 174 F.2d at page 797. This consideration is, we think, made more cogent by the fact that seamen and others performing "ship's work" who might otherwise recover under the doctrine of MacPherson v. Buick Motor Co. are not precluded from recovering by reason of having been injured within the jurisdiction of admiralty. Sieracki v. Seas Shipping Co., D.C.E.D.Pa., 57 F.Supp. 724.

■■■ We may defer decision on this question, however, because the law in this circuit is that not even an owner, albeit out of control, is liable for an unseaworthy condition arising after control has been transferred. See Cannella v. Lykes S.S. Co., supra, 174 F.2d at page 795. And plaintiffs' proof, while it without question establishes unseaworthiness at the time of the explosion, fails to establish that the unseaworthy condition existed at the time defendant sold the vessel. As we shall see, the failure of proof in this case is such as to be fatal not only to plaintiffs' recovery for unseaworthiness, but to recovery on any theory whatever.

The foundation of plaintiffs' case without which, even in their view, no one of the three theories can stand, is that defendant renewed a section of the inner shell. While it seems to be conceded that part of the wrapper and flame sheets were renewed, the record is bare of proof that the repairs were made by defendant. The mere fact that the renewal had been made some time prior to 1944, when defendant's ownership ceased, is not enough since defendant was not the original owner of the tug. Moreover, a renewal such as is here involved must be noted on the inspection record for the year in which it was made. No mention of a renewal is made on the records for the tug, which were available for the years 1925 through 1947, and no records for 1937 and 1938 were found.

Plaintiffs nevertheless contend that the jury could have inferred that defendant made the repair from the following statement contained in the Board's Report: "This [the renewal], as far as can be determined from available records, was installed in 1937." The authors of the report were not called, but their phrasing implies, we think, that their only basis for selecting 1937 was that the record for that year was missing. So fragile a basis is inadequate to support the plaintiffs' burden of proof, even had this "finding" not been rejected, as it was, on review by the Commandant.

But if such a finding were substantiated in the record, as we find it was not, still plaintiffs' position would not be improved: the gap in proof would simply be as to a different element of their case. It would not be enough to prove defendant made the repair; plaintiffs have also the burden of proving that the repair was either made negligently or, though not made negligently, nevertheless made the vessel unseaworthy. If, as claimed, defendant made the repair in 1937, then the boiler operated without mishap for eleven years and was eleven times examined and found fit by the Coast Guard. Plaintiffs introduced no expert testimony that the repair was negligently made, but relied again on the Board Report. They echo the Board's "conclusion" "that the caulking edge of the flame sheet had been welded, giving an indication of a full thickness of metal." This is not advanced as a cause of the explosion, but only for "not detecting the weakened condition of the bottom of the combustion chamber," which was the cause. And while perhaps sufficient to exonerate the Coast Guard inspector, this is not, by itself, sufficient to support a finding that the repair was negligently made. This too was reversed by the Commandant's Report, which concluded that inspections had been inadequate, particularly in view of the fact that at the time of the ex-

plosion the boiler was 30 years old and the renewal, even assuming it was made in 1937, was 11 years old. Plaintiffs nowhere contend that the Commandant's Report is not final and authoritative as to "conclusions," and this particular conclusion seems irrefutable in view of the fact that inspection after the accident disclosed that the water side of the shell was in a badly deteriorated condition. Moreover, negligent repair as a causal factor is refuted by the only explanation of the cause of the accident that we have been able to find in the record. This explanation was made by an expert, Mr. Stanley, who, testifying before the Examining Board in the capacity of advisor to that body, stated that as a result of his examination of the boiler, made two days after the accident, he had come to the following conclusion: "I could see myself it wasn't through any local spot or spots of corrosion, that it was a sort of a mass collapse, but in my opinion, for what it's worth, I think that could only be due to what we call fatigue over a period of years from the bombardment of the steam, and definitely would not be visible to anybody examining the boiler."

Plaintiffs further contend, however, that even if they have not proved actual fault, they have proved statutory fault, which shifted to the defendant the burden of proving that its fault was not a contributing cause of the explosion, citing The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. Here, again, we need not now decide whether the harsh burden of proof rule which was developed without reference to seamen's actions for negligence— in fact before such actions existed— should be extended to them. Nor need we now decide whether Marine Engineering Section 52.01-65, above referred to, sets up a regulatory scheme, rather than a standard of care, and its violation is, therefore, not a *per se* violation of the offenders' duty to any individual. Cf. Lack v. Hunt, 1921, 96 Conn. 663, 115 A. 429; Corbett v. Scott, 1926, 243 N.Y. 66, 152 N.E. 467, 46 A.L.R. 1064. The reason in both instances is that plaintiffs have not proved that defendant violated the Regulation.

The "statutory" violation relied on by plaintiffs is the alleged failure to secure prior approval to make the renewal as required by Marine Engineering Regulation Section 52.01-65. But the only proof that defendant did not secure approval is that the available Coast Guard records contain no such notation—the very fact which led the Board, on whose Report plaintiffs very largely rest their case, to draw the erroneous inference that the repair must have been made in 1937, for which there was no record.

Plaintiffs having failed to introduce any evidence that the vessel was unseaworthy at the time title passed to the new owner, or that any repairs to the boiler were made by defendant, or that there had been any failure by defendant to comply with its statutory duties, the trial judge had no alternative other than to direct a verdict for defendant.

Affirmed.

FRANK, Circuit Judge (concurring).

We all agree that defendant is not liable, on any theory, for the reason that plaintiff failed to present evidence sufficient to establish the fact that, when defendant owned the vessel, there existed a dangerous condition which contributed, or might have contributed, to plaintiff's injury. There is, then, no need here to consider the purely hypothetical problems whether, if plaintiff had established that fact, defendant would have been liable for unseaworthiness of the vessel or for negligence. Therefore, I consider superfluous my colleagues' discussion of those problems. To avoid seeming concurrence in the negative implications of that discussion, I think it well to utter these caveats:

1. As the confines of the unseaworthy doctrine still remain unsettled, I think our court should not intimate that the doctrine may never entail liability in a kind of case which is the subject of no

previous decisions and is not here before us, *i. e.*, to intimate that perhaps in no circumstances will a defendant, the former owner of a ship, be liable to a person, not in "privity" with the defendant, who is injured after the defendant's sale of the ship, for an unseaworthy condition existing when the defendant was still the owner. Should the problem arise, we would want to consider the following: In Grillea v. United States, 2 Cir., 229 F. 2d 687, 689—referring to Cannella v. Lykes Bros. S.S. Co., 2 Cir., 174 F.2d 794—we said that, under a demise (*i. e.*, a bare-boat charter), the owner is liable if the ship was unseaworthy at the time of its delivery to the demisee.[1] In Poignant v. United States, 2 Cir., 225 F.2d 595,[2] we said that Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, had overruled our previous decisions in which we had held that the owner's control of the ship is necessary to impose on the owner liability for unseaworthiness.

2. As to negligence: The doctrine of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, itself an innovation, may not be static, may still be in process of growth. Suppose, for instance, the following: A defendant buys an automobile from a dealer. The defendant so negligently repairs it as to create a latent unsafe condition (*i. e.*, one not discoverable by normal inspection) likely to cause injury, at some later time, to a person driving the car. The defendant subsequently sells it, "as is" or without warranties, but does not warn the buyer of the unsafe condition. The new owner, several years later, allows the plaintiff to drive the car. The plaintiff is injured as a result of that latent unsafe condition, which is like a concealed time-bomb.[3] I do not know whether or not, in some courts (including ours) such a defendant will be held liable to the plaintiff. I think that, in deciding the instant case, we should not intimate how we will decide such a case when it arises.

If it should turn out to be the rule that the former owner of a car, on such facts, is liable, I would think that that rule would apply as well to the former owner of a ship who had behaved in a similar manner. If so, there might be a difference in the burden of proof if the negligent conduct of the former ship-owner constituted a violation of a statute (or regulation) designed for the safety of a seaman or worker on the ship. For, if the doctrine of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, and related cases, were applicable, defendant would have the burden of proving that by no possibility could the violation have contributed to the accident. My colleagues suggest a doubt as to whether that doctrine applies in a suit for negligence by a seaman or other worker on a ship. I have some difficulty in sharing that doubt, in the light of the Supreme Court's generous treatment of such persons; and cf. The Denali, 9 Cir., 112 F.2d 952, 955, certiorari denied Alaska S.S. Co. v. Pacific Coast Coal Co., 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444.

---

1. On rehearing, in Grillea v. United States, 2 Cir., 232 F.2d 919, we held (per Judge Learned Hand) that under a bare-boat charter, for unseaworthiness occurring after the demise, the owner is not liable *in personam* (but that the vessel is liable *in rem*). That, however, is not the case supposed by my colleagues.

2. See also Tarkington v. United States State Lines Co., 2 Cir., 222 F.2d 358.

3. Cf. Fredericks v. American Export Lines, 2 Cir., 227 F.2d 450.

There we held (1) that the MacPherson doctrine is not necessarily avoided by the lapse of time, and (2) that the manufacturer, when sued by an employee of the buyer, is liable even if the buyer, by diligently performing his duty to inspect, would have discovered the defect.