235 F.2d 760
 Rudolph KRAFT, Libellant-Appellant,
v.
SMITH & JOHNSON STEAMSHIP CORP., and T. J. Hammill & Co.,
Respondents-Appellees, and Siemund Marine, Inc.,
Respondent-Impleaded-Appellee.
 No. 266, Docket 23857.
 United States Court of Appeals Second Circuit.
 Argued Feb. 17, 1956.
Decided July 31, 1956.
 
 John J. Robinson, Paul C. Matthews, Edwin M. Bourke and Paul C. Matthews, Jr., New York City, for libellant-appellant.
 J. Ward O'Neill, Haight, Gardner, Poor & Havens, New York City, for respondent-appellee, Smith & Johnson Steamship Corp.
 Edward Ash, Alexander & Ash, New York City, for respondent-appellee, T. J. Hammill & Co.
 Raymond C. Green, Bernard Katzen, Harry Schechter, and William H. Stieglitz, New York City, for respondent-impleaded-appellee, Siemund Marine, Inc.
 The opinion and findings below were not reported. The findings of fact were as follows:
 Findings of Fact.
 '1. On February 26, 1948 libelant, Rudolph Kraft, was employed as a machinist by Siemund Marine, Inc. and was performing the work of covering up suction boxes at the bottom of deep tanks on the S.S. Potus H. Ross at Pier 52, Brooklyn, N.Y.
 '2. The vessel was then under bareboat charter to Smith-Johnson Steamship Corp. and was undergoing repairs in order to carry grain in its lower hold.
 '3. Libelant's employer, Siemund Marine, Inc. was engaged in machinists work, sealing up 'bilge' or 'suction' boxes in the vessel's lower hold, and T. J. Hammill & Co. was engaged in carpentry work, installing grain fittings and wooden bulkheads in the lower hold.
 '4. On February 26, 1948 libelant had completed certain work with a fellow employee, McCarthy, in the No. 2 port tank in the No. 1 hold, and at about 2 P.M. began to transfer tools to the No. 2 tank on the starboard side of the No. 1 hold. While McCarthy went up for more material, libelant lowered a drill into the No. 2 starboard tank and transferred some small tools to the starboard side of the No. 1 hold.
 '5. There was a cluster of light above the two starboard tanks, and an electric wire ran from this light to a receptacle up on the ship's deck.
 '6. Libelant intended to go down an iron ladder into the No. 2 starboard tank, and he proceeded to walk aft in a narrow passage, approximately two feet wide, formed by the coaming on the side of the tank and a wooden bulkhead which ran fore and aft in the center of the hold. Before libelant reached the ladder, the cluster light suddenly went out, and libelant fell into the tank sustaining injuries.
 '7. Libelant's foreman, Callahan, had obtained the cluster light from the ship's stores and had plugged it in a receptacle up on deck and had arranged the light in the lower hold.
 '8. This cluster light was lit before Callahan sent his men into the hold, and each time he made his rounds to see that the work was being done the light was burning.
 '9. Shortly before Callahan was told that libelant had fallen into the tank, he was making his rounds and discovered that the cluster light was out.
 '10. On inspecting the receptacle upon deck he found that the plug on the light his men had been using had been removed from its original socket and put into a 'dead' socket. He also found that the original socket his men had been using was occupied by a plug attached to a light cord which led to a light being used by the carpenters, i.e. the employees of T. J. Hammill & Co., with whom he had an argument concerning the incident.
 '11. None of the ship's crew was present or had any work to do in the No. 1 hold on the day of the accident. There was only a skeleton crew aboard the vessel at the time, and the vessel's crew was signed on the day after the accident.
 '12. No part of the ship's deck or equipment in the lower hold was defective or unsafe.
 '13. The cluster light furnished by the ship was in good condition.
 '14. There was no electric power failure aboard the vessel during the time in question.
 '15. There were eight electrical outlets on the forward mast house on deck, all of which were available for the No. 1 hold where the accident occurred. These outlets were tested with a test light by the vessel's Chief Engineer prior to the commencement of the work and were found to be in good condition, and there were no complaints made by anyone to the vessel's Chief Mate and Engineer concerning them.
 '16. Libelant fell immediately upon the cluster light going out, and there was no interval of time between the extinguishment of the light and libelant's fall.
 '17. Smith-Johnson Steamship Corp. furnished libelant with a safe place to work, and the sole cause of the accident was the intervening negligent act of some unknown person in removing libelant's light plug from its socket, without warning to libelant. The accident was not caused by the insertion of the plug into an allegedly 'dead' socket.
 '18. The tortious act of removing libelant's plug cannot be attributed to the ship's personnel or to the employees of T. J. Hammill & Co.
 '19. T. J. Hammill's employees had no more control over the receptacles and plugs on deck than did libelant and his fellow workers.
 '20. There is no proof that T. J. Hammill's employees moved the plugs or that they had any difficulty with their lights or that they had any reason to change plugs.
 '21. The vessel was not unseaworthy at the time of the accident.'
 Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 To recover for his injuries the libellant-appellant brought a libel based both on negligence and unseaworthiness against the United States Maritime Commission, the owner of the S. S. Pontus H. Ross, Smith & Johnson, the bareboat charterer of the vessel, and T. J. Hammill & Co. which had a contract for the installation of grain fittings therein. Smith & Johnson, the charterer, impleaded libellant's employer, Siemund Marine, and cross-libeled Hammill, both of whom answered and participated in the trial. As to the United States Maritime Commission, the libel was dismissed by consent at the opening of the trial.
 
 
 2
 Having made his findings as above set forth, the trial judge dismissed the libel, the cross-libel and the impleading petition against Siemund Marine. In addition to the libellant, both Hammill and Siemund Marine, obviously to protect their position in event of a reversal, also appealed.
 
 
 3
 The Smith & Johnson Dismissal.
 
 
 4
 The libellant pitches his appeal from the dismissal as to Smith & Johnson on a claim of unseaworthiness. The judge found that at the time of libellant's fall there was a dead electric socket amongst the eight outlets on the forward must house. Finding 10. The libellant contends that the evidence required a further finding, viz., that the dead socket was the cause of his fall. As to this, the judge found to the contrary. Findings 16 and 17. These findings were somewhat amplified by the judge's opinion wherein he said: 'It is also clear that the libelant fell immediately upon the light going out, and that there was no interval of time between the extinguishment of the light and his fall.' Thus in effect it was found that libellant's fall was caused by the act of some unknown person in disconnecting the cluster of lights which illumined the scene and had already occurred before the cord serving the cluster was plugged into the dead socket.
 
 
 5
 Having examined the underlying transcript of testimony, including that of the libellant himself, we cannot say that the finding on the issue of the proximate cause was clearly erroneous. It was for the judge to interpret and evaluate the testimony and to determine whether the libellant had proved by a fair preponderance that the dead socket was the proximate cause. His negative conclusion on that issue, we think, is not shown to rest upon irrational inferences or in other respects conflict with the state of proofs.
 
 
 6
 If, as we hold, this finding may not be set aside, it is unnecessary to consider whether the finding of seaworthiness was erroneous as conflicting with Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Poignant v. United States, 2 Cir., 225 F.2d 595; and Grillea v. United States, 2 Cir., 229 F.2d 687, rehearing denied 2 Cir., 232 F.2d 919.
 
 
 7
 The T. J. Hammill & Co. Dismissal.
 
 
 8
 The dismissal as to Hammill was predicated upon a finding that there was no proof that the Hammill employees had removed the plug serving the cluster lighting the libellant's place of work. On his appeal from this dismissal, libellant, who sought to hold Hammill on the ground of negligence, contends that there was 'a compelling inference that the light plugs were switched by a Hammill employee.' The basis for this inference is laid on the testimony of Callahan, libellant's foreman, that after the accident he found that Hammill's carpenters were using for their work a light connected with the very socket which prior to the accident was being used to light the libellant's place of work. It is argued that this fact 'compelled' an inference that the cord serving the appellant was switched into the dead socket by Hammill personnel.
 
 
 9
 We think, however, that the force of the inference for which the libellant contends was largely negated by Callahan's testimony that shortly before the accident the Hammill carpenters were already served by a light and by the evidence that there had been no power failure to deprive them of that light. Thus the carpenters, so far as appears, had no incentive to divert to their own use the socket which had been serving the libellant. Especially in view of this lack of incentive, the probability of tortious action by the carpenters fell far short of a compelling inference. Viewing the entire record and having in mind the burden of proof which was on the libellant, we cannot say that the relevant findings were based on irrational inferences or that the state of the proofs was such as to compel a finding of negligence on the part of Hammill. In short, the finding of no negligence on the part of Hammill was not clearly erroneous.
 
 
 10
 Since we must affirm on the libellant's appeal, it follows that the other appeals must also be affirmed.
 
 
 11
 Affirmed.