Elijah REED, Libellant,

v.

THE Steamship YAKA, her engines, boilers, machinery, etc., Respondent (Waterman Steamship Corporation, Owner and Claimant)

v.

PAN–ATLANTIC STEAMSHIP CORPORATION, Impleaded Respondent.

No. 123 of 1958.

United States District Court
E. D. Pennsylvania.

April 29, 1960.

As Amended May 4, 1960.

Joseph Boardman, Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

Harrison G. Kildare, Rawle & Henderson, Philadelphia, Pa., for respondent, owner and claimant.

T. E. Byrne, Jr., Krusen, Evans & Shaw, Philadelphia, Pa., for impleaded respondent.

CLARY, District Judge.

This is a libel *in rem* against the S. S. "Yaka" to recover for injuries sustained by the libellant on March 23rd, 1956, while employed as a longshoreman on board that vessel. From the pleadings and proof, the Court makes the following

### Findings of Fact

1. The Court has jurisdiction of the parties and the subject matter of this proceeding.

2. Libellant is a citizen and resident of the Commonwealth of Pennsylvania and at all times mentioned herein was employed as a longshoreman by the Pan-Atlantic Steamship Corporation (hereinafter known as "Pan-Atlantic" to assist in the loading and unloading of cargo aboard the S.S. "Yaka".

3. On March 19, 1956, Waterman Steamship Corporation (hereinafter known as "Waterman"), as owner of the S. S. "Yaka" had delivered that vessel to Pan-Atlantic under a written bare boat charter.

4. As part of the charter agreement, Pan-Atlantic agreed to indemnify and hold harmless Waterman against any liens of whatsoever nature and against any claims arising out of the operation of the vessel by Pan-Atlantic or out of any act or neglect of Pan-Atlantic in relation to the vessel.

5. On March 23, 1956, the S. S. "Yaka" was in possession and control of Pan-Atlantic under the terms of the said bare boat charter, and was lying in navigable waters at Pier A, Port Richmond, Philadelphia, Pennsylvania.

6. On that day Pan-Atlantic undertook to load a cargo of chocolate in cans and cartons aboard the vessel.

7. It provided its own facilities and longshoremen for the loading.

8. Libellant was one of these longshoremen assigned to stow the said chocolate in No. 2 lower 'tween deck of the S. S. "Yaka".

9. At about 2 p. m. on March 23rd, 1956, libellant and other longshoremen laid a floor of the cases of chocolate syrup to act as insulation for the chocolate candy.

10. Cases of chocolate syrup were, therefore, stowed on the deck of the 'tween deck about 2½ feet high in the forward end of the hatch and in the wings.

11. The hatch square of the 'tween deck contained no cargo.

12. The cartons of chocolate candy were then brought aboard on wooden pallets, using ship's winches, and lowered into the hold where the individual cartons were to be removed and stowed by hand.

13. The wooden pallets or cargo trays were constructed of strips of boards approximately an inch thick nailed to blocks at each end and reinforced at the corners, making a hollow rectangular pallet about 4 feet wide, 6 feet long and 4 inches high. Pallets of this type are commonly used for loading cargo in the Port of Philadelphia.

14. These particular pallets belonged to Pan-Atlantic Steamship Corporation.

15. Certain of these pallets were used to make up a staging or platform equal in height to the cases of chocolate used for insulating, so that the drafts of chocolate could be landed at a height equal to the top of the insulating cargo and were thus more easily and quickly stowed.

16. The use of such pallets in this way was the customary, accepted and proper practice when loading cargo of this nature.

17. The pallets used were old and dirty in appearance but were apparantly adequate for the purpose.

18. As the draft of chocolate would be let down into the square of the hatch by the winch, it would be grabbed by three longshoremen and steadied above the deck.

19. One of these longshoremen would then give the winchman instructions to move the draft inshore toward the staging.

20. When the draft was in front of the staging, and still suspended in the air, the three longshoremen would push the draft over the staging.

21. At this point, libellant, who was standing on the staging area, would come forward and assist the other three longshoremen by pulling the draft onto the staging, while they pushed it forward.

22. When the draft was so suspended over the staging, it was the practice for any one of these four longshoremen to yell up to the winchman to lower the draft onto the staging, since he was not in a position to see the draft from on top deck.

23. At this signal, the winchman lowered the draft upon the staging and the four longshoremen would then unload and stow the chocolate by hand.

24. The operation was thereafter repeated until loading was complete.

25. The operation described, including the use of the pallets for staging, was the usual, customary, proper and accepted practice used in loading cartons of Hershey chocolate candy.

26. At approximately 4:30 p. m., after the staging had been in place and use for more than one hour, a draft came down into the square of the hatch and was moved in front of the inshore staging.

27. The three longshoremen pushed the draft over to the staging.

28. The libellant walked out on the staging in order to grab the draft, and did in fact have his hand on the draft in anticipation of pulling it back on the staging

29. At that moment one of the facing boards of the top pallet of the staging upon which libellant was standing broke, and libellant's right foot fell through onto the boards of the pallet underneath.

30. His foot twisted and became entrapped in the pallet.

31. The pain in his foot caused him to let out a yell.

32. The winchman, hearing the yell and supposing it to be a signal to him, landed the draft in accordance with his prior practice.

33. The draft landed on libellant, throwing him down onto the pallet.

34. The draft was soon removed from libellant.

35. Only that board of the pallet through which libellant's foot had fallen was broken.

36. After the draft was removed it was necessary for libellant's foot to be pried out of the broken pallet by the use of a crowbar.

37. Libellant was removed from the hold and taken to Northeastern Hospital for treatment.

38. The pallet which broke contained a latent defect, which defect existed when the pallet was brought onto the ship.

39. Libellant was not guilty of any negligence in this loading operation.

40. The sole cause of this injury was the latent defect in this wooden pallet being used for staging.

41. The S. S. "Yaka" was unseaworthy.

42. This unseaworthiness caused the injury to libellant.

43. Libellant sustained personal injuries for which he is entitled to be compensated.

### Discussion

As pointed out by counsel, the facts of this case are simple, but they nevertheless present two important questions of admiralty law. The first question we will take up is: Did the presence of the defect in the pallet being used by the longshoremen in the hold of the S. S.

"Yaka" for staging render that ship unseaworthy?

### The question of unseaworthiness

The development of the doctrine of unseaworthiness has been left entirely to the courts rather than to the legislature. Whether the result is a happy one is at least debatable.[1] There has been some uncertainty as to what constitutes unseaworthiness and at times it is difficult to discover the essential factors which a district court should look to when asked to resolve this issue. Since it is not our task to remake the law in this area, but only to resolve it within the narrow limits of the case at hand, we simply examine those few cases close in point, to determine which are controlling here. If there appears to be a conflict in the law after our opinion, the parties of course have recourse to a higher tribunal than our own to resolve it.

There are at least two recent cases whose holding clearly encompass the present situation. The first is Considine v. Black Diamond Steamship Corp., D.C.D.Mass.1958, 163 F.Supp. 107. There a longshoreman was injured by a defective "chisel truck", a hydraulically-operated truck with a platformed device for handling heavy bales, etc., which was property of the stevedoring firm and expressly found not to be part of the ship's regular equipment. The District Court held that a defect in this truck caused the ship to be unseaworthy, relying upon several recent Supreme Court opinions (hereinafter discussed). The second case is Di Salvo v. Cunard Steamship Co., D.C.S.D.N.Y.1959, 171 F.Supp. 813. There it was held that a passenger baggage chute (which was regularly stored on the dock and was not kept on the ship at all) when improperly attached to the ship, so as to cause injury to a longshoreman while unloading baggage, rendered the ship unseaworthy.

Moreover there are two cases in our own District which, although they do not go as far as the above cases, are nevertheless indistinguishable in principle from the present case. In Litwinowicz and Matyas v. Weyerhaeuser Steamship Co., D.C.E.D.Pa.1959, 179 F.Supp. 812, Judge Kraft held that where a longshoreman was injured while loading steel beams as a result of a defective "Baltimore dog" (i. e., an "L" shaped device supplied by the stevedoring firm and attached to a hook at the end of the ship's cable, to be used to break out the steel beams), he could recover for unseaworthiness. Also in De Van v. Pennsylvania R. Co., D.C.E.D.Pa.1958, 167 F.Supp. 336, 337, Judge Van Dusen held that where a longshoreman was injured as a result of a cargo hook which had been supplied by the stevedoring firm (and which proved to be unfit for the purpose for which it was used), he could recover for unseaworthiness.

Finally, there are two recent Supreme Court cases which held that where equipment which was supplied by the stevedoring firm for performing the ship's work proves incapable of performing its function and, as a result, causes an injury to a longshoreman, the ship is liable for unseaworthiness. Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, reversing, 3 Cir., 1953, 205 F.2d 57; Alaska Steamship Co., Inc. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming 9 Cir., 1953, 205 F.2d 478. In the Rogers case the longshoreman was injured by a defective land fall runner, supplied by the stevedoring firm and operated by one of its men; while in the Petterson case the longshoreman was injured by a defective block which had been brought on board the ship by the stevedoring company for use in loading the ship.

The respondents attempt to distinguish several of these opinions and also affirmatively rely upon the case of Brabazon v. Belships, Inc., 3 Cir., 1953,

---

1. See for instance DiSalvo v. Cunard Steamship Co., D.C.S.D.N.Y.1959, 171 F.Supp. 813.

202 F.2d 904.[2]  Although the Court is not persuaded by either their attempt to distinguish libellant's authority or their reliance upon the Brabazon case, we will briefly discuss their position on each of these cases.

First, they attack the Considine case, supra, as having been improperly decided in apparent reliance upon a case which was later reversed by the Supreme Court.  Halecki v. United New York & N. J. Sandy Hook Pilots, etc., 1958, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541.  The Halecki case was not the principal case relied upon by Judge Aldrich, if indeed he relied upon it at all.[3]  Moreover the reasoning upon which the Supreme Court based its reversal of the Halecki case has no bearing upon the facts of the Considine case.  The work being performed by the longshoreman in the former was expressly stated to be "in no way 'the type of work' traditionally done by the ship's crew.  It was work that could not even be performed upon a ship ready for sea, but only when the ship was 'dead' with its generators dismantled.  Moreover, it was the work of a specialist, requiring special skill and special equipment—portable blowers, air hoses, gas masks, and tanks of carbon titrachloride, all brought aboard the vessel for this special purpose, *and none connected with a ship's seagoing operations.*"  358 U.S. at page 617, 79 S.Ct. at page 519.  (Emphasis added).  In the Considine case, on the contrary, the work being performed was loading of cargo—work traditionally done by a seaman.  Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.  The object being used was a chisel lift, special equipment only in the sense that it may have been specially designed to load cargo.  We think respondent's attempt to distinguish the Considine case is completely without merit.

Turning to the two recent cases in our own District, the respondents have little to say except that in the Litwinowicz and Matyas case, "the device there was owned by the stevedore and had been attached to and incorporated into the ship's cargo handling gear."  The cargo hook or the "Baltimore dog" was no more *incorporated* into the ship than the staging in our own case.  In each instance, the object which proved defective was being used on the ship to perform a function traditionally performed by a ship's crewmen (i. e., loading).  A specific finding of fact in our own case is that the use of pallet boards for a staging in the manner described "was the usual, customary, proper and acceptable practice * * * [for] loading cartons of Hershey chocolate candy."  Unless we are to attach some special significance to the fact that the "hook" and the "Baltimore dog" were physically attached to a piece of a ship's equipment, while the pallets were merely resting upon the hold of the ship, the Court can see no logical distinction between these cases.

Finally, in an effort to distinguish the Supreme Court's holding in the Petterson case, the respondent stresses the following factors: (1) there was no evidence as to whether the particular block was property of the shipowner or the stevedore; (2) it was of the type and kind usually composing ship's gear; and (3) its incorporation into the ship's regular cargo handling gear made it an "appurtenance" of the ship and rendered the shipowner in that case liable in the same way he would have been liable had title to this particular piece of equipment been traced to the shipowner.  These factors differ from those in our case and are therefore not controlling.

That the block was "incorporated" into the ship's gear is a conclu-

**2.** Neither party cited the Di Salvo case or the Rogers case.

**3.** For authority, Judge Aldrich first cited the Alaska Steamship Co. case and then the Rogers case.  Following the latter appeared the notation "Cf." followed by the Halecki case.  Thus, rather than rely upon the Halecki case, as contended by respondent, it appears he cited it as possible contrary authority.

sion and is of no help in answering the question before us. Why was the block "incorporated" into the ship's regular cargo handling gear and the staging not? The only answer offered by respondent would seem to be that the block (1) *may* have been property of the shipowner, and (2) it was the type and kind of equipment *usually* composing ship's gear. Reliance upon these factors seems to overlook the basic rationale upon which the courts have developed the right of a longshoreman to recover for unseaworthiness. That is, they view him as a seaman when he is engaged in loading the ship's cargo—work traditionally performed by a seaman. Seas Shipping Co. v. Sieracki, supra. If the seaman traditionally performed the task of loading this cargo, it was the ship which presumably supplied him with materials necessary to accomplish this task. In other words, the law in this area logically negates the concept of an independent contractor performing the task of unloading. To inject such a third person into the picture, for the purpose of determining today what equipment does not belong to the shipowner or is not part of his standard gear, in order to resolve the issue of seaworthiness, is incongruous.

Although this would appear to be a logical conclusion, perhaps nowhere in the law is one less justified to rest assured in logic than in the area under discussion. Nevertheless we can do no more than rely upon precedent, when that precedent is distinguished solely by factors which we feel have no logical significance to the issue at hand.

We have purposely left until last the case of Brabazon v. Belships, Inc., supra, the only affirmative authority relied upon by the respondents on this point. A small part of that opinion dealt with the question of whether the particular plank which caused the accident rendered the ship unseaworthy.[4] The Court reached the conclusion that it did not (although it allowed recovery on other grounds) and in a sentence pointed up the factors which apparently influenced its decision, i. e., "The unknown source of the board, its transitory placement and its lack of any characteristic adapting it for particular shipboard use or differentiating it from other miscellaneous lumber all combine to require the conclusion that the object was not an 'appurtenance' of the ship as that term is used in connection with the shipowner's special responsibility for seaworthiness of ship's gear and appliances." 202 F.2d at page 908. None of these factors are present here.

■ The defective pallet came from the stevedore and as we mentioned above, we see no reason why this fact should preclude a finding of unseaworthiness, since, for the purposes of recovery, the law views the longshoreman as a member of the ship's crew—necessarily negating the concept of a third party (independent stevedore) supplying the gear and appliances ordinarily used to stow cargo.

Furthermore we are not dealing with a "transitory placement" in our case. The pallet was intentionally placed upon the floor of the hold by the longshoreman at the beginning of their loading operation. It had been there for over an hour prior to the time of the accident. It would necessarily remain there until completion of the loading operation, since its use there was the usual, customary, proper and acceptable practice for loading cartons of Hershey chocolate. It was no more transitory than the cargo hook in the De Van case or the "Baltimore dog" in the Litwinowicz and Matyas case.

Finally, this pallet did have characteristics which made it adaptable for loading the particular type cargo involved on the ship. This is borne out by the fact that the longshoremen regularly used these pallets in just this way when loading this type cargo. They did not on one occasion use pallets and on an-

---

4. The case dealt primarily with the question of negligence on the part of the shipowner.

other use dunage or hatchboards or other wood. The pallets were placed there intentionally to fulfill a need—just as the cargo hook or "Baltimore dog" fulfilled a need. To the extent they were so placed—and were not merely *thrown down for a moments use*—they became an appurtenance of the S. S. "Yaka" and rendered that ship *pro tanto* unseaworthy.[5]

### The Question of Liability in Rem

We turn then to the second question of law in this case, which both parties agree has never been decided in the Third Circuit. The question simply stated is: May a stevedore employed by a bare boat charterer maintain an action *in rem* against the vessel to recover damages for personal injuries caused by unseaworthiness which arose *after* the ship was surrendered to the bare boat charterer?

The First Circuit in Vitozi v. Balboa Shipping Company, 1 Cir., 1947, 163 F.2d 286 held that a stevedore, in an *in personam* action based upon unseaworthiness which allegedly existed at the time of demise, could not recover from the real owner of the ship when the injury occurred while the ship was in the possession and control of the charterer. The basis of Circuit Judge Woodbury's opinion was that responsibility for seaworthiness of the vessel rested on the charterer under a demise charter and liability for unseaworthiness in the civil action therefore could not be asserted against the real owner. However, in Grillea v. United States, first reported at 2 Cir., 1956, 229 F.2d 687, on rehearing, 1956, 232 F.2d 919, the Second Circuit held that an action might be maintained against the vessel *in rem*, based upon an unseaworthy condition which arose after the demise.

The problem in this case arises from the fact that the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq. (hereinafter referred to as the "Act") specifically states that compensation required to be paid under that Act by the employer "shall be exclusive and in place of all other liability of such employer * * *", 33 U.S.C.A. § 905. The impleaded respondent Pan-Atlantic, who is liable to the libellant for compensation, argues that since it is owner of the ship *"pro hoc vice"* under the terms of the bare boat charter, an action against the ship *in rem* would in effect be an action against it and is therefore barred by the exclusive remedy provision of the Act, 33 U.S.C.A. § 905. In support of its position it points to the case of Smith v. The Mormacdale, 3 Cir., 1952, 198 F.2d 849, which held that where the employer of a stevedore is also the owner of the ship, the stevedore can not recover against the ship *in rem*, because in such a situation, "an action against the vessel is realistically an action against the employer * * * [and] [t]o impose this additional liability on the employer in a situation where he is also shipowner would radically distort the intent of Congress in enacting the Longshoremens' Act", at page 850.

Undoubtedly, it is the stevedore who will be required to pay if recovery is allowed here. However, this fact alone is not controlling. Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. When the reason that such liability will ultimately fall upon the stevedore is traceable to a contract of indemnity with the real owner, he of course can not escape liability by setting this fact up as a defense.

5. The respondents strenuously argue that even if the pallet were found defective, it nevertheless was fit for the purpose for which it was intended. Such an argument completely ignores a specific finding of fact in this case, i. e., that the use of such pallets in this way was the customary, proper and acceptable practice when loading cargo of this nature. To say that the pallets were only "intended" to be used to transfer cargo between the dock and the ship, is to say that what was a customary, proper and acceptable practice was *not* intended.

We think that is precisely what the respondent seeks to do here.[6] It does not rely solely upon an indemnity clause but rather upon a "bare boat charter", which contains, among other things, an indemnity clause. Nevertheless the *critical* clause in this charter—the clause on which respondent must rely in order to establish the fact that he will stand liable in the present case (which of course was not brought against him but against the S. S. "Yaka") is the indemnity clause.

Respondent makes much of the other features of a bare boat charter. It is true that such a charter results in a complete surrender of operation and control of the ship to the charterer. Leary v. United States, 1871, 14 Wall. 607, 20 L.Ed. 756. To emphasize how complete this surrender of ownership is, many cases speak of the charterer under a bare boat charter, as the owner of the ship *"pro hoc vice"*. Leary v. United States, supra; Randolph v. Waterman et al., D.C.E.D.Pa.1958, 166 F. Supp. 732. That is a term of art. We do not think that an answer to the present case is to be reached by a detailed exploration of its history and significance. We simply point out that whatever bundle of rights in the ship the real owner surrenders under a bare boat charter, he does retain the right to the return of his ship at some future time.

To the extent that recovery *in rem* against the ship jeopardizes this unsurrendered right, this action is just as much "in reality" against the owner, as it was "in reality" against the stevedore in the Smith case, supra. The fact that an indemnity clause may exist, can not change this *for the purpose of determining whether the exclusive remedy provisions of the Longshoremen's and Harbor Workers' Act precludes recovery*. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra.

Moreover the question of operation and control of the ship would appear to have no real significance in an *in rem* action for unseaworthiness, since unseaworthiness is not based upon negligence or any wrongful act. Rather it is a form of absolute liability which is imposed regardless of fault. Seas Shipping Co. v. Sieracki, supra. Therefore we are not particularly persuaded by the nature of a bare boat charter. This fact might be more evident if we imagine a case with the exact same facts as the present one, the only difference being that the bare boat charter contained no indemnity clause.[7] In such a suit the charterer would not (as it did here) move to strike the real owner of the vessel as respondent and itself defend the action. Yet the real owner undoubtedly could not set up the Longshoremen's and Harbor Workers' Act as a bar to recovery. The only difference between such a case and our own is the indemnity clause, which the Supreme Court has said is not determinative. See, Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra.

6. The short answer to the respondent's defense lies in dictum of the Supreme Court in the case of Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 880, 90 L.Ed. 1099. There the Court stated, "[The obligation of seaworthiness] is peculiarly and exclusively the obligation of the [ship's] owner. It is one he cannot delegate. By the same token it is one he cannot contract away * * *." The respondent seeks by means of the bare boat charter to contract for sole responsibility for unseaworthiness and then set up the Act as a bar to recovery.

7. Undoubtedly an indemnity provision is a standard clause in a bare boat charter (or demise charter, as it is sometimes referred to), and would always be required by the real owner. Nevertheless it is not an essential element of such a charter in the sense that without such a clause the charter would not in fact be a bare boat charter. Indeed a bare boat charter without an indemnity provision constitutes a more complete surrender of ownership than one with such a clause, since the *sole* right reserved by the real owner would be the right to the return of physical possession of the ship—with or without incumbrances.

The law is settled that where a stevedore is injured as a result of unseaworthiness which arose after the real owner surrendered control to a bare boat charterer (who is not the stevedore's employer), the stevedore can still recover in an *in rem* action against the ship. Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.

The question of who defends (i. e., the real owner or the charterer under an indemnity clause) is not controlling. We see no reason why the result should be otherwise where the charterer and the stevedore are one and the same person. There are reasons why a court might find otherwise where only *one* person is involved as owner-stevedore combined. The Third Circuit accepted such reasons in the Smith case, supra. However, the reasons why an *in rem* action against the vessel in such a case is realistically viewed as an action against the stevedore (and thus barred under the Act) are not traceable to any contract of indemnity between parties. In our case they would be. This distinction is fatal to respondent's position. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra. Furthermore we see nothing in this result which will frustrate the clearly manifest intent of Congress to limit the employer's liability to his employee to the remedy provided by the Act. On the contrary, to hold otherwise would be to invite contracted for situations such as we have here, for the sole purpose of destroying a longshoreman's *in rem* remedy which the law of admiralty has traditionally recognized. The Act was not intended to diminish longshoremen's rights, but to enlarge them. Seas Shipping Co. v. Sieracki, supra.

It follows from what has been said above that the issue of liability must be determined in favor of the libellant. Waterman Steamship Corporation as claimant of the vessel will therefore be responsible in damages to the libellant in an amount to be determined at a subsequent hearing. It also follows that the liability imposed in this action against the claimant, the owner of the vessel, must, under the bare boat charter, be ultimately paid by the impleaded respondent, Pan-Atlantic Steamship Corporation.

Conclusions of Law

1. The Court has jurisdiction of the subject matter and of the parties to this suit.

2. The latent defect in the pallet being used for staging in the No. 2 hold of the S. S. "Yaka" rendered that ship unseaworthy.

3. This unseaworthiness was the sole cause of the injury complained of here.

4. The libellant was not guilty of any contributory negligence.

5. The S. S. "Yaka" is liable *in rem* to libellant.

6. Respondent, Waterman, as owner an claimant of the S. S. "Yaka", is liable to libellant in an amount to be determined at a later hearing.

7. Impleaded respondent, Pan-Atlantic, is liable over to Waterman under the terms of the bare boat charter, for the amount of libellant's recovery.