Robert **MORALES** et al., Libellants,

v.

**CITY OF GALVESTON** et al.,
Respondents.

No. 2013.

United States District Court
S. D. Texas,
Galveston Division.

March 24, 1959.

Mandell & Wright (Arthur J. Mandell), Houston, Tex., and Milton Schwartz, Houston, Tex., for libellants.

McLeod, Mills, Shirley & Alexander (Preston Shirley), Galveston, Tex., for respondent City of Galveston.

Lockhart, Watson & Peterson (Edward W. Watson), Galveston, Tex., for respondent Cardigan Shipping Co.

Royston, Rayzor & Cook (Bryan F. Williams) Galveston, Tex., for intervenor Texas Employers Ins. Ass'n.

CONNALLY, District Judge.

This is an in personam proceeding in admiralty, brought by eight longshoremen, as libellants, to recover for personal injuries which, it is alleged, they received from breathing noxious fumes and gases while they were employed loading or "trimming" wheat aboard a vessel at Galveston, Texas. Respondents are (a) the City of Galveston, owner and operator of the grain elevator wherein the wheat in question had been stored, and from which it was being loaded aboard the vessel, and (b) the owner and operator of the vessel in question.

As to their cause of action against the city, libellants allege that this respondent was negligent in that the city had fumigated the wheat in question for the purpose of killing weevils; that the fumigant used was a strong and dangerous chemical which was harmful to human beings when they were exposed to the fumes emanating therefrom in concentration; that by reason of prior incidents of a similar nature, respondent city had knowledge of this danger, and the probability of harm, and should have exercised a high degree of care in fumigating the wheat, etc. Additionally, libellants contend that if the fumigants were not applied by the city in its elevator, but by other parties, then the city still should have been aware of the possible danger to libellants, and should have made tests and inspections of the grain to determine whether such fumes and gases were present.

As to the owner of the vessel, the contention is made that the vessel was unseaworthy in that, immediately on any quantity of the grain containing the fumigant having entered the hold, the hold became a dangerous and unsafe place for libellants, and immediately became unseaworthy, regardless of whether there was any knowledge, or means of knowledge, on the part of the Master or her crew in regard thereto. It likewise is contended that there was negligence on the part of the vessel and her crew, in that tests and other precautions against the happening of such an incident should have been taken.

In connection with the action, I make the following findings of fact and conclusions of law.

### Findings of Fact

1. On March 13, 1957, the SS Grelmarion was berthed in the harbor of Galveston, Texas, at a wharf adjacent to Elevator B, for the loading of a cargo of wheat from that elevator. The elevator was owned and operated at that time, and at all material times, by the respondent City of Galveston, a municipal corporation. The loading operations were by Texports Stevedores, Inc., an independent stevedoring concern, not a party to this action. Texports was the employer of the longshoremen—libellants here—and they were engaged as "trimmers" of the wheat to be loaded aboard the Grelmarion in one of the bins of her No. 2 hold. The respondent Cardigan Shipping Co., Ltd., was owner and operator of the Grelmarion at all material times.

2. In the operation of Elevator B, the City of Galveston acts as bailee-warehouseman. Wheat (and other grains not here material) are received at the elevator from inland points of origin, usually by railroad car, though to a lesser extent by barge and by truck. The

grain is stored for the account of the owner, and upon his direction thereafter is delivered by the elevator to carriers, almost exclusively for export: Normally such grain is commingled, and the owner-depositor does not receive the identical grain which he deposited. The elevator's obligation is fulfilled when it makes delivery, on his order, of grain of the same quality or grade, in like amount.

3. The grain is stored in Elevator B, in one or more of some 400 bins, or separated storage compartments, within the elevator. Records are carefully maintained of the quantity and grade of the grain in each such bin. When a vessel is to be loaded, a number of such bins are drawn upon for the necessary wheat. It is moved from the bins by means of a series of conveyor belts. A particular bin is tapped, or drawn upon, by opening an outlet at the bottom of the bin (as I understand it, much like opening a water hydrant), whereby the contents of the bin in question trickle in a steady stream onto the conveyor belt. The grain thus drawn from many bins is collected and mixed in a large "shipping bin" from whence it is conveyed by spout into the hold of the vessel.

4. In loading grain, the hold of a vessel usually is partitioned into a number of bins, which are simply smaller compartments within the hold. The grain enters in a steady and rapid stream from the spout above the hold; and in doing so naturally forms a pile, in the shape of a cone, in the bottom of the bin or hold. Longshoremen, in trimming grain, enter the bin and by means of shovels manually move the grain from its position in the center, where it is piled, into the corners and far reaches of the bin being loaded. Thus, the longshoremen frequently are standing or kneeling upon the grain previously leveled, and as the loading progresses, they are frequently required to work in close quarters.

5. Wheat (and other grains not material here) may become infested with weevils, the presence of which will re-

duce or destroy the commercial value. This condition is controlled by fumigating the grain. A number of fumigants or insecticides are used commercially for this purpose. When the grain is received, and while it remains in the railroad cars, the respondent city fumigates the grain when inspection indicates that fumigation is necessary. In these circumstances "High-Life" is used. A quantity of this product is poured at various places over the top of the car of grain. "High-Life" is heavier than air, and sinks and seeps through the grain. The cars which are so treated are segregated, and after a matter of several days the grain is placed in the elevator. A careful record is kept of the cars so treated, and of the grain withdrawn therefrom.

6. Occasionally, wheat within the elevator is found to require fumigation. In that event, "Weevilcide" is used as the fumigant, and is applied in the same manner. While this product (as is true of "High-Life" and other fumigants) contains ingredients which admittedly are dangerous and harmful if there be long exposure thereto in heavy concentrations, when such fumigant is properly applied to a quantity of grain, the gases and fumes are dissipated to such an extent as no longer to be dangerous or harmful in a matter of 24 to 48 hours. It is the practice of the respondent city to keep careful record of each of the bins so fumigated, and to leave the contents thereof undisturbed for a period of at least 72 hours.

7. When grain is received in the railroad yards for deposit in Elevator B, it is carefully examined while still in the railroad cars by inspectors for the Galveston Cotton Exchange & Board of Trade (all of which is supervised by the United States Department of Agriculture). This is a very thorough examination, wherein samples are taken from various locations within each carload. While the inspection is made primarily to determine the quality and grade of the grain, and not primarily for the purpose of determining whether it recently

has been fumigated, the inspection includes an examination for any unusual odor.

8. Further examination and inspection is made of grain in every instance as it leaves the spout, and immediately before it enters the hold of the receiving vessel. Inspectors for the Cotton Exchange & Board of Trade are stationed at the spout and, at regular intervals, take samples of the grain, which are carefully examined by laboratory technicians. Here too, any unusual or offensive odors are noted. If the inspection warrants such action, the loading may be stopped.

9. The Grelmarion began loading the morning of March 13, 1957, and continued without incident throughout that day and the following morning, until interrupted for the lunch hour on March 14. When the longshoremen returned to work in the offshore bin of the No. 2 hold at about 1 p. m., March 14, 1957, the bin was approximately three-fourths full, the grain then extending to within some four or five feet of the top of the bin. A last "shot" of grain was called for, and was released into the bin. This quantity of grain completely covered the hatch opening (which was the only means of entrance and exit for the longshoremen, and was the only source of ventilation); hence, the longshoremen were working for the moment in an area completely enclosed and without access to outside air. This in itself was not an unusual incident.

10. Almost immediately the longshoremen felt ill effects. This was manifested by a burning and stinging sensation in the nose and throat, watering of the eyes, and a choking sensation. A certain amount of hysteria developed. The attention of those on deck was attracted, and the spout was shut off. The men dug a passageway through the grain and climbed and were assisted to the deck and the open air. Some experienced nausea and dizziness.

11. I find as a fact that certain noxious fumes and gases were introduced into the bin with the last "shot" of grain which was loaded after 1 p. m., and that such fumes resulted from an insecticide applied at some point to destroy weevil infestation. I further find that the condition and complaints of the libellants were not—as the respondent city contends—attributable solely to a temporary oxygen deficiency in the bin, coupled with hysteria.

12. The evidence as to the origin of the insecticide which I find to have been used on the wheat in question is not at all satisfactory. From the books and records of the respondent city, tending to show that little, if any, wheat had been fumigated within a matter of weeks prior to this incident, and to the effect that such wheat as had been so treated was not loaded aboard the Grelmarion; from the evidence showing that vast quantities of wheat and other grains had been loaded through the elevator, some eight to ten percent of which had been fumigated by the city, without similar incident in recent years; and from the effects which the fumes had upon the libellants, and the symptoms which they manifested, I find that the fumes were those from chloropicrin, an insecticide which had never been used by the respondent city, and which in all probability was applied at some inland elevator before the grain was transported to Galveston.

13. I find that for the fumes and gases to have remained for a sufficiently long period of time as to be harmful, as was the case here, of necessity unduly large quantities of the chloropicrin must have been applied to the grain when it was so fumigated at the inland elevators; and that in normal and customary use and application of this fumigant it would not have been harmful for longer than 48 to 72 hours after its application.

14. I find that neither of the respondents knew, or in the exercise of reasonable care should have known, that this quantity of grain, which had been improperly treated with an excessive amount of fumigant, was in the elevator or loaded aboard the Grelmarion; and that (for all the evidence shows here)

the respondent city, in the operation of its elevator, had never received knowledge of a prior instance where chloropicrin or other fumigants applied at inland elevators had adhered to the grain sufficiently long as to present danger after receipt by the elevator.

15. I find that the respondent city was not negligent in failing to know or learn of the presence of this quantity of grain within its elevator, in failing to make some additional inspection therefor, or in any other particular. The record shows without dispute that careful and painstaking inspections and examinations were made under governmental authority when the grain was received, and again as it was disbursed by the elevator, which in the present instance failed to detect the presence of the remaining traces of fumigant in this quantity of grain. I find that had additional inspections been made by the respondent city, there is no reason to believe that such inspections would have been more successful.

16. I find—as libellants contend—that several incidents not unlike that giving rise to the present action have occurred in Galveston, and I further find that all parties hereto, namely, the libellants, some of whom were therein involved, the vessel (through her Galveston agents), and the city, all had actual knowledge thereof. These are as follows:

(a) In 1949, while the Lipscomb Lykes was loading grain at Galveston, a similar incident occurred in which some 140 longshoremen working in various holds of the vessel were sickened and made ill by fumes from grain being loaded. Judge T. M. Kennerly, of this Court, found as a fact that the city had fumigated the grain in question; that it had done so negligently by using excessive quantities of fumigant, and by failing properly to aerate the grain. By reason thereof, liability was imposed on the city (Miranda v. City of Galveston, D.C.S.D.Tex., Galveston Division, 98 F.Supp. 245, affirmed City of Galveston v. Miranda, 5 Cir., 205 F.2d 468).

(b) In 1950, a number of longshoremen were similarly affected while loading grain aboard the Panamolga in Galveston. Only the vessel and her owner were libeled, and the city, as operator of the elevator, was not a party to that proceeding. Judge Thomsen, of the U. S. Dist. Court for the Dist. of Maryland, absolved the vessel and her owners of blame, and found the Panamolga seaworthy. The Court was of the view (in the absence of the city) that the fumigant had been applied in and by the elevator, and found as a fact that whatever fault there was, was that of the city, in that the city had agreed to notify the ship's agent when grain recently fumigated was about to be loaded, and that no such notice was given to the agents of the Panamolga in that case (McMahon v. The Panamolga, D.C., 127 F.Supp. 659).

(c) In 1953, the Zosianne, while loading grain at Galveston, experienced a somewhat similar incident. An action was filed in this Court by a number of longshoremen to recover for alleged injuries from having breathed noxious fumes (Ad. 1987, Galveston Div.), charging that fumigants were applied by the city to grain in the elevator. This action was settled, and was never tried.

(d) There is some mention in the evidence of a comparable incident on the Mormacmoon in 1950. The evidence as to what transpired in that instance is not clear, only that a comparable claim was made.

17. I find that the Grelmarion's cargo spaces were of customary design and construction; that they were clean, and in all respects ready to receive the wheat; and had been surveyed and approved prior to loading. No fumigation for weevils was made aboard the vessel, and none was necessary. While the Grelmarion's cargo spaces were not equipped with forced ventilation systems, I find that only very rarely is this the case on grain vessels, and that it is not necessary or customary. I find that the vessel was not unseaworthy in any

respect or particular, and that her Captain, crew, agent, or other representatives were not negligent in any particular.

18. The finding heretofore has been made that the noxious gases and fumes were introduced into the bin with the last "shot" of grain, and resulted from a fumigant that had been improperly applied, and that had adhered to the grain an unusually long period of time. Under these circumstances, I find that the admission thereof into the bin of the vessel did not cause the Grelmarion to become unseaworthy, the vessel and all its appurtenances being entirely adequate and suitable in every respect.

19. Each of the libellants here in due course applied for, and received, compensation and medical treatment as provided by the Longshoremen and Harbor Workers Compensation Act, 33 U.S.C.A. § 901 et seq. The amounts paid to them, and for their benefit, were as follows:

| Name | Medical Payments | | Compensation Paid |
|---|---|---|---|
| Jesse Ovalle | $216.75 | 7 weeks | $ 416.57 |
| Fidencio Balli | 8.75 | 2 weeks | 56.52 |
| Juan Arrandondo | 71.75 | 7 weeks | 378.00 |
| Miguel Mejia | 302.75 | 13 weeks (total) | |
| | | 15 weeks (partial) | 1372.05 |
| Apolonio Ovalle | 200.25 | 7 weeks | 424.29 |
| Miguel Serrato | $ 49.00 | 7 weeks | 325.22 |
| Robert Morales | 270.50 | 13 weeks (total) | |
| | | 15 weeks (partial) | 1186.58 |
| Nick DeLeon | 216.75 | 7 weeks | 408.86 |

I find the medical payments and expenses set out above to have been necessary for the proper care and treatment of the libellants, and reasonable in amount. Medical payments made to Dr. Mendell, not included in the foregoing, I find to have been incurred primarily for the purpose of securing the testimony of this physician on the trial of the case, and such medical services, if any, as he rendered were not necessary to the treatment and care of libellants.

20. I find that the damages sustained by each of the libellants as a direct and proximate result of the injuries received on the occasion in question were as follows:

| | |
|---|---|
| Jesse Ovalle | $1,000.00 |
| Fidencio Balli | 500.00 |
| Juan Arrandondo | 1,000.00 |
| Miguel Mejia | 1,500.00 |
| Apolonio Ovalle | 1,000.00 |
| Miguel Serrato | 1,000.00 |
| Robert Morales | 1,500.00 |
| Nick DeLeon | 1,000.00 |

### Conclusions of Law

1. I conclude that Texas Employers Insurance Association, having made payments under the Longshoremen and Harbor Workers Compensation Act, as the insurer of Texports Stevedores, Inc., employer of the libellants, having sought leave to intervene and assert its claim by way of subrogation, should be

permitted to intervene herein. The motion to that end is granted.

2. §§ 15 and 15A of the Code of the City of Galveston, Texas, require that before an action for personal injury may be maintained against the city, the claimant shall within 30 days following the accident make report thereof to the city, setting out certain information with regard to the accident, extent of injuries, etc. Admittedly, none of the libellants here complied therewith, but filed this action December 11, 1957, some nine months after the cause of action arose. Respondent City of Galveston filed its plea in abatement and exception to the libel, contending that the failure to comply with such Code provisions had barred the action as a matter of law; and, alternatively, that if the action be not barred as a matter of law, nevertheless the libellants were guilty of laches in failing to comply therewith, comparing such provisions to a State statute of limitation.

 Provisions of this character in city charters are valid under Texas law if the period for notice is a reasonable one, and compliance must be had as a condition precedent to recovery against the city (City of Houston v. Hruska, 155 Tex. 139, 283 S.W.2d 739, and cases there cited). State statutes and local rules, however valid locally, may not contravene general maritime law, and may not materially prejudice or interfere with the proper harmony or uniformity thereof (Workman v. City of N. Y., 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314; Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086). The libellants here were engaged in a purely maritime service while the vessel was lying in navigable waters. The cause of action which they assert is one afforded, and governed, by principles of maritime law. I conclude that the Code provisions, if given effect, would work a material prejudice to the application of the maritime law, and interfere with the uniformity thereof; and that failure to comply with such Code provisions does not preclude recovery as a matter of

law. I conclude further that the libellants were not guilty of laches in having filed the instant action within a period of nine months after the incidents complained of occurred.

3. I conclude that neither of the respondents herein has breached any legal duty owing to the libellants which would impose liability upon such respondents, and that libellants and intervenor are not entitled to recover.

Clerk will furnish counsel copy of the foregoing findings and conclusions.

Counsel for respondents will prepare and present decree within ten days.