Albert **BELL**, Plaintiff,

v.

**NIHONKAI KISEN, K. K., TOKYO**, a corporation, company or association, and George S. Fujii, Defendants.

**NIHONKAI KISEN, K. K.**, Cross-Plaintiff,

v.

George S. **FUJII**, Cross-Defendant,
George S. **FUJII**, Cross-Plaintiff,

v.

**NIHONKAI KISEN, K. K.**, Cross-Defendant.

Civ. No. 60–481.

United States District Court
D. Oregon.

April 26, 1962.

Philip A. Levin, of Pozzi, Levin & Wilson, Portland, Or., for plaintiff.

John R. Brooke, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendant Nihonkai Kisen, K. K., Tokyo.

Nathan J. Heath, of Gray, Fredrickson & Heath, Portland, Or., for defendant George S. Fujii.

BEEKS, District Judge (sitting by designation).

On July 25, 1960, the steamship DAIRETSU MARU was lying alongside Central Dock at Coos Bay, Oregon. A log was in the process of being lifted by use of ship's tackle from the water alongside for stowage in No. 1 hatch. Plaintiff was a longshoreman in the employ of a master contract stevedore and the loading was being performed by fellow employees. At a time when the log had reached a point above No. 1 hatch it broke in two from a pre-existing latent defect (probably inherent vice) and a piece of the log fell into No. 1 hold striking plaintiff.

The controversy between plaintiff and defendant Nihonkai Kisen, K. K., Tokyo, owner of the DAIRETSU MARU, has been submitted to the Court upon the foregoing facts. The only issue tendered is the novel question of whether a shipowner warrants to longshoremen working aboard his vessel that the cargo being loaded is in a safe condition for loading.

The question was posed but left unanswered in Carabellese v. Naviera Aznar, S. A. (C.A.2, 1960), 285 F.2d 355, cert. den. 365 U.S. 872, 81 S.Ct. 907, 5 L.Ed.2d 862, and in Beard v. Ellerman Lines, Ltd. (C.A.3), 289 F.2d 201, reversed as to the shipowner's indemnity action, sub. nom., Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., U.S., 82 S.Ct. 780 (decided April 2, 1962), and insofar as can be ascertained the precise issue has not heretofore been determined. Consequently, it might be well to review the basic concepts upon which the doctrine is founded. It is said by some that it had its origin in the ancient law of the sea. Such a pedigree seems spurious but whatever its origin it became an established part of our maritime jurisprudence in the dictum of The Osceola.[1] For many years thereafter, except for a few awakenings, the doctrine slumbered until it was resurrected by Mahnich[2] and thereafter completely revitalized by Sieracki[3] and the host of cases which have followed.

It was proclaimed in Osceola that a vessel and her owner are liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship. Mahnich widened the orbit of unseaworthiness as to crew members and Sieracki opened the door to longshoremen and a boundless number of other maritime workers performing work of a character traditionally performed by seamen.

Since Sieracki a veritable revolution has occurred in broadening the field of indemnity. For example: In Petterson v. Alaska S.S. Co., Inc. (C.A.9), 205 F.2d 478, affirmed per curiam 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, the vessel was held unseaworthy because a snatch

1. 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.

2. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

3. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

block brought aboard the vessel by the injured longshoreman's employer broke; In Boudoin v. Lykes Brothers Steamship Company, Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, the ship was held unseaworthy because a crew member was not equal in disposition to the ordinary man of the calling; in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, the doctrine was held to apply to a transitory condition not affecting the basic seaworthiness of the vessel; in Grillea v. United States (C.A.2), 232 F.2d 919, the vessel was held unseaworthy even though the injured longshoreman had himself participated in causing the condition (misplaced hatch cover); and in Palazzolo v. Pan-Atlantic S.S. Corp. (C.A.2), 211 F.2d 277, aff'd sub. nom., Ryan Stevedoring Company, Inc. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, unseaworthiness was found to exist because the cargo had been improperly stowed.

Following the doctrine enunciated in Ryan, it has been held that cargo may create an unseaworthy condition because not properly handled, as in Gindville v. American-Hawaiian Steamship Company (C.A.3), 224 F.2d 746; or stowed in the wrong order for safe discharge as in Amador v. A/S J. Ludwig Mowinckels Rederi (C.A.2), 224 F.2d 437, cert. den. 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791; or from the defective condition of a cargo crate which gave away when the longshoreman stepped upon it, as in Reddick v. McAllister Lighterage Line, Inc. (C.A.2), 258 F.2d 297, cert. den. 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229; or the stowage of a truck chassis which provided an unstable footing as in Rich v. Ellerman & Bucknall S.S. Co. (C.A.2), 278 F.2d 704.

While the doctrine of liability without fault has undoubtedly been extended far beyond anything the learned author of Osceola could have envisioned, an analytical review of the reported cases reveals that the basic concept of unseaworthiness as announced in Osceola predominates throughout, i. e. an unsafe condition of a ship or its equipment, with a crew and the place of work within a ship being held an integral part of the ship. As said in Grillea, 232 F.2d at page 922:

"It is indeed true that to constitute unseaworthiness the defect must be in the ship's hull, gear or stowage * * *",

and in Carabellese v. Naviera Aznar, S. A., supra:

"In Reddick v. McAllister Lighterage Line, Inc., 2 Cir., 258 F.2d 297, 299, certiorari denied 1958, 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229, where again the injury was in the course of unloading, the majority held that unseaworthiness could be predicated not only on improper stowage, as in the cases just cited, but also upon a latent defect in a cargo crate which gave way when the plaintiff longshoreman stepped upon it. However, the majority noted that the crate had been in the owner's 'exclusive possession and control for the two days preceding the accident.' Since there was no evidence that the owner had known or could have known of the latent defect, this must have been designed to bring out that the crate had in effect become a part of the working surface supplied to the longshoreman, so that the owner would be liable for a latent defect in the crate as he would for one in the deck or even, as was held in Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, for a misplaced cover which the injured longshoreman had himself installed over part of a hatch. The same principle underlies Rich v. Ellerman & Bucknall S. S. Co., 2 Cir., 1960, 278 F.2d 704. That, like the instant case, related to an injury sustained in loading, but the unseaworthiness lay in the stowage of truck chassis previously loaded which turned out to afford an unstable footing. *Thus the chassis in Rich, like the crate in Reddick and the hatch cover in Grillea, had become, as was said in the Grillea*

*case at p. 923, 'as much a part of the 'tweendeck for continued prosecution of the work, as though it had been permanently fixed in place.'*

"We may assume the cited decisions would govern if the * * * crate had been improperly stowed and had fallen on the plaintiff as he undertook some later operation. But we know of no case that has imposed absolute liability on the owner where the alleged danger was inherent in the cargo and this was still in the course of being loaded. *Hence the question posed is whether the owner warrants to longshoremen not simply a safe place in which to handle cargo but cargo which is safe to handle.*

"*We are not disposed so to extend the doctrine, at least on the facts here.*" (Emphasis supplied.)

Thus, underlying all of the extensions and variations in the doctrine is the basic concept that it relates to the ship and to those things appertaining and belonging to the ship. Cargo in and of itself has never been considered an integral part of the ship. From ancient times they have been regarded as separate interests.[4] The cases which hold that there is liability on the part of the ship where cargo has been involved deal not with the inherent safety of the cargo but rather with the manner in which it has been stowed or thereafter utilized by or on behalf of the ship. In short, if cargo has been stowed or thereafter utilized in such a manner as to imperil the safety of seamen, the warranty comes into full bloom.

In support of his contentions, plaintiff cites Valerio v. American President Lines (D.C.S.D.N.Y.), 112 F.Supp. 202, and the following passage from Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., supra:

"So far as we know the jury may have found respondents liable not on either of those two grounds but solely on a third, namely because of defective bands—a matter which was covered by the charge to the jury on the issue of unseaworthiness, and properly so. * * *"

I disagree that these cases lend support to plaintiff's theory. In Valerio the cargo was known by the shipowner to be hazardous and requiring special precautions. The shipowner was under a duty to warn and protect the longshoreman. He failed to do so and the longshoreman recovered from the shipowner on well established principles of negligence. In Ellerman, the injured longshoreman was assisting in the discharge of bales of burlap, each of which was banded by four parallel one inch steel bands. The bales were discharged three at a time, two hooks being placed under two of the bands on each bale. During the operation, two bands of one bale broke, the bale fell and Beard, a longshoreman working in the hold, was injured.

Both cases involved cargo being discharged from the ship and the precise issue tendered here was involved in neither. The appeal in Ellerman involved only the right of the shipowner to indemnity from the stevedore. In fact, the Court of Appeals specifically refused to pass upon the question involved here, Beard v. Ellerman Lines, Ltd., supra, wherein it is said:

"The opinion stated makes it unnecessary for us to consider the issue of unseaworthiness which was premised on Beard's view that the doctrine of unseaworthiness extends to the packaging of the ship's cargo; and that the cargo in the instant case was 'unseaworthy' by reason of the 'inadequacy' of the steel bands used to bind the burlap bales",

and the question was not involved on appeal to the Supreme Court.

Assuming arguendo, that Ellerman holds the vessel to be unseaworthy because of defects in the steel bands used to bind the cargo, the holding would not appear to be an extension of the now established doctrine. The band was utilized by the stevedore instead of a sling

---

4. See Lowndes & Rudolf on General Average.

or pallet board in performing an obligation of the ship, the discharge of the cargo therefrom. The result is no different than the stevedore having supplied a defective pallet board, as in Reed v. The Yaka (E.D.Pa.), 183 F.Supp. 69; or a defective tong as in Massa v. C. A. Venezuelan Navigacion (C.A.2), 1962 A. M.C. 415, 298 F.2d 239.

Whatever may have been the wisdom of the extensions to date, they are now established law which this Court must follow. A further extension of the doctrine, however, would not only result in operational chaos on the part of the shipowner but would logically lead to the shipowner being required to warrant the disposition of passengers and the safety of their baggage, thus substantially closing the gap in the nearly completed circle of absolute liability which now envelopes him.

Plaintiff argues that the enforcement of the warranty sought here would afford a much more satisfactory line of demarcation than the rather vague criterion suggested by Carabellese. Perhaps true. Uniformity is a goal to be achieved but its social desirability should be addressed to the Congress rather than the courts. I believe as did the Court to which I am accountable. I quote from Berryhill v. Pacific Far East Line, 9 Cir., 238 F.2d 385, at page 387:

"Appellant asks us to step one further pace toward an absolute liability of the owner of a vessel for defects existing in equipment that the ship could do without, that the owner may never have bought or even seen, or have had any reason to know it existed.

"The appellant has his statutory remedy against his employer. Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. He has his common law remedy as a business invitee against the shipowner, if he can prove the latter's negligence. In view of such rights and protection, he does not need, nor should he ask, for the further extension of a doctrine already stretched. If there exists a social need for such an extension (which we doubt in view of existing remedies), it is a matter for Congressional enactment, and not for this Court to bring about, thru judicial legislation. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 286, 72 S.Ct. 277, 96 L.Ed. 318."

Plaintiff's cause of action as to the defendant Nihonkai Kisen K. K., Tokyo is dismissed with costs.