Guiseppe CASTORINA, Plaintiff,

v.

LYKES BROS. STEAMSHIP CO.,
INC., Defendant.

Civ. A. No. G–80–267.

United States District Court,
S.D. Texas,
Galveston Division.

Jan. 12, 1984.

Stephen M. Vaughan, Mandell & Wright, Houston, Tex., for plaintiff.

James R. Watkins, Royston, Rayzor, Vickery & Williams, Galveston, Tex., for defendant Lykes Brothers Steamship Co., Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUGH GIBSON, District Judge.

Plaintiff brought this cause of action pursuant to 33 U.S.C. § 905(b) and the general maritime law to recover for injuries sustained as a result of exposure to asbestos. All defendants and third parties in this case, other than Lykes Bros. Steamship Co., Inc. (hereinafter "Lykes"), settled or have been dismissed for lack of evidence that plaintiff handled asbestos on the named vessel or for the named stevedore. Lykes' third party actions against Egnep, (Pty), Ltd., General Mining, and Cape Asbestos have been severed from this action. A default judgment has also been entered as against Cape Continent Shipping Co. for failure to answer. This case was tried to the Court without a jury March 21–25, 1983. The Court, after considering the evidence and legal issues presented, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Guiseppe Castorina is a 63-year old longshoreman who has worked on the Galveston docks from 1955 to the present through ILA local # 307, and, in earlier years, ILA local # 1576. From 1965 to 1972 plaintiff worked on numerous vessels, including those owned by Lykes, discharging raw asbestos packaged in burlap bags.

2. At all times material hereto, defendant Lykes was and is a Louisiana corporation, with its main office and principal place of business in New Orleans, Louisiana. Defendant was the owner and operator of the vessels MARGARET LYKES, STELLA LYKES, JAMES McKAY, LETICIA LYKES, SUE LYKES, WILLIAM LYKES, KENNETH McKAY, RUTH LYKES, GIBBES LYKES, AIMIE LYKES, and CHARLOTTE LYKES.

3. From 1965 to 1972 Lykes transported asbestos in burlap bags from South Africa to the Port of Galveston in the above named vessels, among others. Lykes provided the stevedoring services to these vessels through its own in-house stevedoring division.

4. According to plaintiff's testimony, he worked on numerous vessels discharging asbestos but could only specifically remember working on Lykes ships. In matching the records of the Galveston Wharves indicating the dates of Lykes vessels discharging asbestos, with plaintiff's work records indicating the dates plaintiff worked and for what employer, the Court adduces that the following are the dates of plaintiff's possible exposure:

| Date | Vessel |
| --- | --- |
| 3/14–18/65 | MARGARET LYKES |
| 3/22–23/66 | STELLA LYKES |
| 5/15/66 | JAMES McKAY |
| 6/27/66 | LETITIA LYKES |
| 12/8/67 | SUE LYKES |
| 1/12/68 | WILLIAM LYKES |
| 1/31–2/1/68 | KENNETH McKAY |
| 5/7–8/68 | STELLA LYKES |
| 7/4/68 | CHARLES LYKES |
| 11/13–14/68 | RUTH LYKES |
| 9/23/69 | GIBBES LYKES |
| 12/7/70 | WILLIAM LYKES |
| 9/25/71 | AIMEE LYKES |
| 3/24/72 | AIMEE LYKES |
| 5/5/72 | CHARLOTTE LYKES |

5. Plaintiff and other longshoreman testified that the manner of stowage of the asbestos in loose-weave burlap bags in the holds of these vessels was such that, when the longshoremen would open a hatch to go into the hold, they would find raw asbestos loose in the holds, and would occasionally find torn bags of asbestos. In the course of offloading, the bags would be tossed around, would fall out of the slings or nets used to discharge them, would be torn by cargo hooks, and would otherwise be struck or jostled in such a way as to cause asbestos dust to escape from the burlap bags into the atmosphere.

The dust became so pervasive that at times it would cause clouds of asbestos in the holds of the vessels. The sun would show the particles in the atmosphere as it streamed in through the hatchway. The asbestos would cling to the bodies and clothing of the longshoremen to such an extent that they would occasionally have to wipe their mouths, expectorate, or take a drink of water to clear their mouths and throats of the asbestos. Some longshoremen would wet a handkerchief and tie it around their mouths to help filter out some of the asbestos.

When the asbestos bags were set down on the wharf, three of the four corners of the net would be disconnected from the crane, and the fourth corner raised in such a way as to dump the bags onto the wharf. This process, as well as the process of stacking the bags onto pallets, caused asbestos to escape into the atmosphere where the men were working.

After the asbestos was discharged, a longshore gang would go aboard the vessel to clean out the holds. Sometimes the loose asbestos to be cleaned out of the hold would be several inches deep. These longshoremen swept the asbestos from the sides and floors of the holds, putting it into barrels, which in turn were removed from the vessels. This process likewise stirred up the asbestos.

At trial plaintiff testified that he worked all of the above-described cargos on one or more occasions. The Court finds that plaintiff was exposed to and did inhale large amounts of asbestos while working on Lykes vessels.

Plaintiff, other longshoremen and Lykes employees testified that respirators were supplied to the longshore gangs. The longshoremen did not use the respirators because they interferred with vision and were hot and bulky to wear. Most testified that cloth or paper masks would have been more useful.

6. The medical testimony at trial showed that as a result of plaintiff's exposure and inhalation of asbestos dust, he now suffers from asbestosis.

Plaintiff's medical history reflects that he was a two-to-three-pack-a-day smoker for 26 years. In approximately 1969 plaintiff quit smoking. In the spring of 1975, plaintiff was treated by Dr. H.B. Kelso, Jr., for wheezing in the left side of his chest. X-rays taken in St. Mary's Hospital in Galveston on April 18, 1975, showed an area of dense infiltrate in the anterior aspect of the right middle lobe and repeated chest x-rays showed persistence of this abnormality. While in the hospital, plaintiff had chest discomfort, especially when lying flat. On October 19, 1976, plaintiff was treated for increased shortness of breath on exertion and told Dr. Kelso that "the shortness of breath has reached the point where it is interfering with my work." On October 22, 1976, the chest x-ray film revealed a "rather marked degree of pleural thickening at both bases" of his lungs, and Dr. Kelso recommended to plaintiff that he be admitted to the hospital for further workup which plaintiff refused.

Medical testimony presented at trial showed that the conditions found by Dr. Kelso were manifestations of asbestosis. In 1979, plaintiff was diagnosed by Dr. F.J. Zaunbrecher as suffering from asbestosis. This lawsuit was filed in 1980.

7. Between 1965 and 1972, Lykes carried the cargoes of asbestos from South Africa to Galveston, Texas, as a common carrier, pursuant to the terms and conditions of its membership in the South &

East African Conference. Under the terms and provisions of the tariff set by the Conference for its northbound freight traffic, its members were required to accept cargo in South Africa packaged in conformity with the rules and regulations of the United States Coast Guard and the Department of Transportation, providing that such cargo was not listed as dangerous or hazardous.

As a common carrier, Lykes was regulated by the Shipping Act, 46 U.S.C. § 801, *et seq.* Common carriers are required to file tariffs with the Federal Maritime Commission and are only allowed to enter into shipping conference agreements approved by the Federal Maritime Commission. 46 U.S.C. §§ 814 and 817. Common Carriers are subject to monetary penalties for discriminatory shipping practices. 46 U.S.C. § 815. A common carrier may not refuse to carry the goods of a qualified shipper.

8. Between 1965 and 1972, asbestos was routinely and regularly shipped from South Africa to the United States in burlap sacks. Asbestos in burlap sacks was not listed as dangerous or hazardous cargo by the tariff, the United States Coast Guard, or the Department of Transportation. The evidence adduced at trial showed that Lykes carried asbestos cargos in conformity with all shipping regulations.

9. Plaintiff's industrial hygienist testified that in 1965 it was known that exposure to asbestos could cause asbestosis, mesothelioma and other related lung disorders. The reports, journals and texts he referred to dealt with workers continuously exposed to asbestos when bags were being poured into hoppers, when asbestos was being woven into fabric or manufactured into products, and when asbestos insulation was being installed into ships. These articles appeared in scientific and medical journals. None of these reports were widely circulated nor did they appear in any journal or test which carriers would have consulted for guidance as to the safety of individuals handling cargo. None of these articles addressed the handling of bagged raw asbestos or intermittent exposure. No evidence was adduced at trial that Lykes officers knew or should have known of the danger of asbestos from 1965 to 1972.

## CONCLUSIONS OF LAW

1. This action is within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1331.

2. Plaintiff has brought this cause of action for recovery under two theories: negligence and breach of the warranty of seaworthiness. Defendant urges that defendant was not negligent in its operations; that plaintiff's claim is barred by laches; that post-1972 LHWCA is applicable; and that the causative defect resulting in plaintiff's injury was an unknown defect in cargo and not a defect in the packaging, stowing, or unloading of cargo.

3. In applying the doctrine of laches to asbestos cases the analogous two-year limitation period begins to run at the time plaintiff discovers, or in the exercise of reasonable diligence should have discovered, his injury. *Fusco v. Johns-Manville Products Corp.*, 643 F.2d 1181, 1183 (5th Cir.1981). *See Eagle-Picher Industries v. Liberty Mutual Ins. Co.*, 682 F.2d 12, 25 (1st Cir.1982); *Clutter v. Johns-Manville Sales Corp.*, 646 F.2d 1151 (6th Cir.1981); *See also Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (statute of limitations for silicosis does not begin to run until the disease manifests itself). Generally, the date of discovery coincides with the date of diagnosis. *Fusco, supra.* Under federal law, "[A] cause of action does not arise until the plaintiff can first successfully maintain suit on that cause of action." *Bellamy v. United States*, 448 F.Supp. 790, 793 (S.D.Tex.1978). Logically, plaintiff could not successfully maintain a suit prior to the date of diagnosis. While diagnosis of the disease need not be "medically confirmed," it is necessary that plaintiff be apprised by some trained individual that he has, or may within reasonable probability have, asbestosis. *See Fusco, supra*, where the court found that plaintiff received sufficient notice when he was informed by an industrial safety engineer

that his examination and diagnosis indicated that he had asbestosis. *See also Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 113–17 (D.C.Cir.1982) where the court found that diagnosis of mild asbestosis in 1973 did not trigger running of statute of limitation on separate, distinct, later-manifested mesothelioma, engendered by the same asbestos exposure.

Plaintiff in this case consulted a physician for pulmonary dysfunction in 1975 and 1976, but was not diagnosed as having asbestosis until 1979. On all occasions plaintiff's symptoms were consistent with asbestosis. In 1976 plaintiff's doctor did urge him to submit to further testing which might have led to a diagnosis of asbestosis, but plaintiff refused to be hospitalized.

■■■ The Court concludes that plaintiff was not apprised of his condition until 1979 and filed this action within the analogous two-year period of limitation. In considering the equitable issues of laches, the Court further concludes that if plaintiff should have, in the exercise of reasonable diligence, discovered his injury in 1976, the defendant was not prejudiced by the time of the filing of this suit.

4. During the pendency of this case the Court denied third-party defendant Gulf Stevedoring's motion for dismissal, citing *Harrison v. Flota Mercante Grancolombiana*, 577 F.2d 968, 793 n. 2 (5th Cir.1976). In their motion, Gulf urged that this cause of action arose after 1972 and § 905(b) of LWHCA barred cross-plaintiff from seeking indemnity from the longshoreman's employer. *See Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1032 (5th Cir.1977) for discussion of the effect of the 1972 amendments of the LHWCA. The Court, in its order dated July 30, 1982,

ruled that in this case, like *Harrison*, "the operative facts occurred prior to 1972, and, hence, pre-amendment law applies, and third-party plaintiff may seek indemnity from third party defendant."

In *Harrison*, the plaintiff, a longshoreman, was exposed to liquid chemical isobutyl acrylate when it spilled in the hold. Plaintiff's injury was traumatic in nature as opposed to one arising from an occupational disease. Harrison immediately experienced burning eyes, sore throat, skin irritation, a headache, but he continued to work for five to six weeks during which time his condition worsened. He became seriously ill and was totally disabled.

At trial in 1976, Harrison asserted an unseaworthiness claim against the vessel. The court found the plaintiff's action and the vessel owner's cross action for indemnity from the stevedore were proper because the operative facts giving rise to the suit occurred prior to the effective date of the 1972 amendments. 33 U.S.C. § 905.

■■ Defendant distinguishes the case at bar from *Harrison* in that the damages arising from this plaintiff's exposure to asbestos did not arise until after the 1972 amendments. Under the LHWCA, the date of injury is used to determine whether pre- or post-1972 amendment law applies for both compensation claims and third party actions.[1] *See Director, Office of Worker's Compensation Programs, Department of Labor v. Hernandez*, 588 F.2d 173 (5th Cir.1979). The defendant urges that the "date of injury" in asbestosis cases should be the date of manifestation as opposed to the date of last exposure.

■■ No method has yet been prescribed for computing the date of injury in third party long-latency occupational disease cases. The Fifth Circuit has not rendered

---

1. Pre-amendment longshoremen within the Act, and post-amendment longshoremen not covered by the Act, are governed by the general maritime law. They are seamen pro hac vice entitled to the warranty of seaworthiness. *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 99, 66 S.Ct. 872, 879, 90 L.Ed. 1099 (1946); *see Aparicio v. Swan Lake,* 643 F.2d 1109, 1113–15 (5th Cir. 1981). Post-1972 amendment third-party causes

of action against vessels by covered workers arise out of, are authorized, and limited by the Act. *Id.* As part of the 1972 amendments to the LHWCA, Congress enacted section 905(b), "providing a person covered by the Act with a negligence action against the vessel, expressly abrogating the 'warranty' of seaworthiness and specifically prohibiting the vessel's attempts to seek indemnity from the stevedore employer." *Id.*

any opinion indicating whether the date of injury for compensation claims or third-party actions in asbestos cases is the date of last exposure or the date of manifestation of the disease. Fixing the date of injury at the time of the operative facts, under *Harrison*, seems to indicate the date of last exposure is applicable. However, the factual basis and legal argument which support *Harrison*, a traumatic injury case, are distinguishable from occupational disease cases. The circumstances of the date of injury in asbestosis cases and in other occupational disease cases are inherently different from those in traumatic injury cases.

The Deputy Commissioners in this district at the order of the Assistant Director of Longshore and Harbor Workers' Compensation,[2] is currently applying in asbestosis cases the date of manifestation theory, as stated in *Todd Shipyards v. Black*, 717 F.2d 1280 (9th Cir.1983).[3] The Ninth Circuit, in *Todd Shipyards Corp. v. Black*, held that, "compensation under the Act must be computed based on the date [that the] injury manifested." *Id.* at 1289. The BRB in the Ninth Circuit had, prior to *Dunn v. Todd Shipyards Corp.*, 13 Ben.

Rev.Bd.Serv. 647 (1981), applied the date of manifestation theory. The Benefits Review Board (BRB) reversed itself in *Dunn* and adopted the last date of exposure rule. *Dunn* was cited by the BRB in applying the last date of exposure rule in the administrative hearing of *Todd Shipyards Corp. v. Black, supra.* On review of the BRB decision in *Todd Shipyards v. Black*, the Ninth Circuit Court of Appeals held that the last date of injury in asbestos cases was "completely contrary to the express purposes of the LHWCA." *Id.*[4]

Black worked for Todd Shipyards as a welder from 1942 to 1945. During his employment he was exposed to large doses of asbestos. In 1977 Black underwent surgery to remove the upper lobe of his right lung because of a squamous cell carcinoma. While recovering from surgery Black was examined and diagnosed as having asbestosis.

The appellate court in *Black* examined the common sense meaning of "injury" and the usage of "injury" in Section 910 of the Act. Quoting *Grain Handling Co. v. Sweeney*, 102 F.2d 464, 466 (2d Cir.), *cert. denied*, 308 U.S. 570, 60 S.Ct. 83, 84 L.Ed.

---

**2.** A LHWCA circular dated June 7, 1983, from Neil A. Monte to all regional administrators, assistant regional administrators, assistant deputy commissioners and national office staff states in pertinent part:

On May 23, 1983, the U.S. Court of Appeals for the Ninth Circuit issued its long awaited decision in *Todd Shipyards v. Gerald Black and Director, OWCP.*

.    .    .    .    .

The Court clearly rejected the Board's rationale in *Dunn v. Todd Shipyards*, 13 BRBS 647. The *Dunn* decision is described as "ill considered and contrary to the express purpose of the LHWCA..."

In addition, the Court advised that the time of manifestation theory is far more likely to insure that injured workers will be fairly compensated for their future earning capacity. The Court thus rejected the date of last exposure theory for determining average weekly wages.

.    .    .    .    .

The Director, OWCP is in agreement with the decision and the decision is to be applied by all Deputy Commissioners.

**3.** While deference is given an administrative agency's interpretation of mixed questions of

law and fact, particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry, "this deference to an administrative agency's decisions on questions of law is not conclusive." *Coca-Cola v. Atchison, Topeka & Santa Fe Ry. Co.*, 608 F.2d 213 (5th Cir.1979). Accordingly, the Court does not find the agency's interpretation binding but does give it significant consideration.

**4.** *See also* Perkins, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1983, H.R.Rep. No. 575, 98th Cong., 1st Sess. (1983) which notes that the Committee on Education and Labor "specifically rejects the Benefits Review Board decision in *Dunn v. Todd Shipyard. Id.* at 12. The Committee proposes to adopt the date of manifestation rule for occupational disease cases with long latency periods. *Id.* at 10–12. Two dates of "manifestation" are proposed and applicability would depend upon whether the worker was currently employed or retired. The date of injury for those who are employed is defined as the date which the occupational disease manifests itself through loss of wage earning capacity. Retired persons would become disabled at the date of impairment of functional capacity. *Id.* at 11.

478 (1939), the court held, "a disease is no disease until it manifests itself." *Id.* An average person would not consider himself injured because he was exposed to a potentially dangerous substance but rather would consider himself injured when the substance caused a dysfunction. Most urban dwellers are exposed to the various substances which cause occupational diseases. Many of these exposures cause no discernable harm. In asbestosis and silicosis cases 20 or more years may elapse before a harmful exposure results in any manifestation of disease.

In discussing both compensation law and general tort law, the Ninth Circuit concluded that "[i]n cases of occupational diseases with long latency periods, the trend is clearly toward the application of the time of manifestation rule." *Id.* at 1290, citing *Wilson v. Johns-Manville Sales Corp., supra.* This Court concurs in that conclusion and adopts the time of manifestation as the "date of injury" for purposes of LHWCA third-party asbestosis actions.

5. The last date of exposure is, however, plausible as the date of injury under equitable theories. First, seamen are the wards of the court in admiralty, and great deference is afforded to them in protecting and liberally construing their rights. *Seas Shipping Co. v. Sieracki, supra* at 91–92 n. 9, 66 S.Ct. at 875–876 n. 9; *The State of Maryland,* 85 F.2d 944, 945 (4th Cir.1936). Asbestos has a latency period of 10 to 20 years. Plaintiff in this instance was exposed, as evidenced by his work history and the circumstances of his medical condition, prior to 1972. Plaintiff, as a seaman pro hac vice under pre-'72 amendment law, was entitled to the warranty of seaworthiness. *Seas Shipping v. Sieracki, supra.*

The Fifth Circuit considered an analogous situation when it examined the anomalies between the general maritime remedies and statutory seamen's remedies. *Smith v. Ithaca Corp.,* 612 F.2d 215 (1980). Smith, a seaman, suffered a heart attack as a result of benzine exposure. Forty-one of the 161 days Smith was aboard the S/S V.A. FOGG, the vessel carried benzine cargo. The evidence showed that benzine fumes permeated the crew's quarters and that Smith's exposure to the fumes aggravated his pre-existing heart condition. Smith was exposed to the fumes in port, in state territorial waters, and at sea. He died shoreside two days after he was discharged from the vessel.

Smith's widow initiated suit in the Death on the High Seas Act, 46 U.S.C. § 761–768, the Jones Act, 46 U.S.C. § 688, and the general maritime law. The district court awarded plaintiff damages for loss of society. Non-pecuniary damages are not recoverable under the Jones Act or DOHSA, but are recoverable under the general maritime law. The Fifth Circuit held that

> when a seaman dies of an indivisible injury which is caused in part by unseaworthiness and inflicted over a period during which the vessel which he is a member of the crew cruised coastal waters and the high seas, the seaman's survivors may recover damages for loss of society under the general maritime law in addition to any damages recoverable under the Jones Act or DOHSA.

*Id.* at 226. *See Hlodan v. Ohio Barge Lines, Inc.,* 611 F.2d 71 (5th Cir.1980). The Fifth Circuit accorded the plaintiff the full benefit of the anomalies between the remedies where recoverability was shown under each.

The remedies arising under the post-'72 amendment LHWCA differ substantially from the panoply of seamen's remedies. The post-'72 LHWCA is a complete statutory remedial scheme, wholly unlike the patchwork of overlapping statutory and general maritime remedies availed to the seaman. The 1972 amendment increased the rate of compensation; provided workers covered by the Act with a negligence action against the vessel, expressly abrogating the warranty of seaworthiness; and abolished the judicially created indemnity cycle between the vessel and the stevedore. *Aparicio v. Swan Lake,* 643 F.2d 1109, 1113–15 (5th Cir.1981). As such, the

post-'72 statute comprises a comprehensive remedial scheme between the covered worker, the vessel and the employer stevedore. No remnants of the general maritime *Sieracki* seaman's status remain for workers covered by the LHWCA Act.

■ In applying the statutory scheme of the Act, the court should be constrained to follow the black letter law of the statute enforcing the intent of Congress as codified. The Fifth Circuit specifically held in *Aparicio* that "the statute itself must be our polestar" in construing the remedies and limitation of the LHWCA. 643 F.2d at 1116. The Court therefore concludes that plaintiff's equitable arguments are without merit. Accordingly, the Court having found that plaintiff's effective date of injury was the date of manifestation diagnosis, concludes that plaintiff's action is governed and limited by 33 U.S.C. § 905(b).

■ 6. Under post-1972 LHWCA law, a vessel owner owed a duty to the longshoremen to exercise ordinary care, prior to the commencement of cargo operations, to make that portion of the vessel to be used by the stevedore reasonably safe for the operations of a competent, expert stevedore performing in a reasonably safe manner, and to warn the stevedore of any latent dangers which the vessel interest was or should have been aware of. *Scindia Steamship Navigation Co. v. De Los Santos*, 451 U.S. 156, 157, 101 S.Ct. 1614, 1616, 68 L.Ed.2d 1 (1981). The vessel owner has no duty to inspect or supervise stevedoring operations, *Id.* 167–170, 101 S.Ct. at 1622–1623, and only has a duty to intervene if he has knowledge of a dangerous condition and of the stevedore's unreasonable conduct in continuing operations. *Duplantis v. Zigler Shipyards*, 692 F.2d 372 (5th Cir.1982); *Pluyer v. Mitsui O.S.K. Lines*, 664 F.2d 1243 (5th Cir.1982).

■ The Court having previously found that defendant did not and should not have known of the dangers of asbestos packed in burlap bags during the time of plaintiff's exposure, and that defendant complied with federal regulations pertaining to the carriage of asbestos, concludes that defendant was not negligent in any manner under section 905(b).

7. The Court further concludes that even if plaintiff could assert a claim for unseaworthiness, the evidence presented at trial is insufficient to support a finding of liability.

■ The warranty of seaworthiness is not an unconditional warranty of safety but is a warranty of fitness for duty. *Smith v. American Mail Line*, 525 F.2d 1148 (9th Cir.1975). This warranty extends to the fitness of the ship appurtenances. *The OSCEOLA*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), crew, *Smith v. American Mail Line, supra,* method of cargo stowage, *Ryan v. Pacific Coast Shipping Co.*, 509 F.2d 1054 (9th Cir.1975), and cargo containers, *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 212–13, 83 S.Ct. 1185, 1189–90, 10 L.Ed.2d 297 (1963), but not to the cargo itself, *Smith v. American Mail Line, supra* at 1150; *see Morales v. City of Galveston*, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); *Bell v. Nihonkai Kisen K.K. Tokyo*, 204 F.Supp. 230 (D.C.Or. 1962). To constitute an unseaworthy condition, the defect must be in the ship's hull or gear or stowage. *Grillea v. United States*, 232 F.2d 919, 922 (2d Cir.1956). Since cargo has never been considered an integral part of a vessel, an inherent vice, defect, or the dangerous nature of cargo will not render a vessel unseaworthy. *Bell v. Nihonkai Kisen K.K. Tokyo, supra* at 233.

The issue presented here is whether asbestos cargo packaged in burlap bags, if presumed "defective," is defective because of its packaging or because of the inherent nature and properties of asbestos. The question is complicated by the finding that at the time of plaintiff's exposure, defendants did not know of the danger to longshoremen exposed to asbestos in the manner and with the frequency that plaintiff was exposed. Assuming that packaging asbestos in triple plastic wraps cures the problem of exposure, the question of whether the package or the cargo was "de-

fective" during the period of plaintiff's exposure remains unresolved, as knowledge of the danger is required to afford protection.

A fine distinction is drawn between cargo and packaging. In *Bell v. Nihonkai Kisen K.K. Tokyo, supra,* a log, with a preexisting latent defect, broke in two while being lifted by ship's tackle. A piece of the log fell into the hold striking the plaintiff, a longshoreman. The Court found that the injury was caused by a defect in cargo and refused to extend the warranty of seaworthiness.

In *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines,* 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962), where a longshoreman was injured when the steel bands around a bundle of burlap broke, the bundles of burlap were discharged by placing a hook under two of the four steel bands. When the load was lifted, the remaining two bands broke and the bundle hit the plaintiff.[5]

The *Bell* court distinguished its holding from *Ellerman* by pointing out that the stevedore in *Ellerman* used the bands instead of a sling to discharge the cargo. The bands therefore became ship's tackle, an appurtenance of the vessel. *Id.* at 233–34. The log in *Bell* was simply cargo and the vessel does not warrant that cargo will be safe to handle. *Id.* at 233.

A vessel owner need not have any type of knowledge of a packaging defect to be liable for unseaworthiness. *Gutierrez v. Waterman, supra* at 213, 83 S.Ct. at 1189, *Simpson Timber v. Parks,* 390 F.2d 353 (9th Cir.1968); *Reddick v. McAllister Lighterage Line, Inc.,* 258 F.2d 297, 299 (2d Cir.1958). In *Simpson Timber v. Parks,* a longshoreman was injured when he stepped through the packaging on a bundle of doors. The Second Circuit upheld the jury finding that the vessel was unseaworthy despite the fact that the shipowner neither knew nor, in the exercise of reasonable care, could have known of the dangerous condition and the fact that the dangerous condition was created solely by the manufacturer's wrongdoing. *Id.* at 355.

The holding in *Parks* is distinguishable from *Bell,* in that *Bell* deals with the inherent safety of the cargo and *Parks* deals with the manner in which cargo has been stowed and thereafter utilized in such a manner as to imperil the safety of the seamen. Only in the latter instance does the warranty of seaworthiness come into full bloom. *Bell, supra* at 233. The package in *Parks,* like the unstable truck chassis in *Rich v. Ellerman & Bucknall S.S. Co.,* 278 F.2d 704 (2d Cir.1960), the crate in *Reddick, supra,* and the hatch cover in *Grillea, supra,* had become "as much a part of the 'tweendeck for continued prosecution of the work as though it had been permanently fixed in place." *See Id.* at 923; *Bell, supra* at 232–33.[6]

A vessel owner does have a duty, however, to warn a stevedore or take reasonable precautions against known or reasonably foreseeable defects in cargo. *See Morales v. Galveston,* 370 U.S. 165, 171, 82 S.Ct. 1226, 1230, 8 L.Ed.2d 412 (1962). This duty does not extend the warranty of seaworthiness to cargo. *Smith v. American Mail Lines, supra* at 1150. A vessel owner could be shown to be liable under an ordinary standard of negligence for failure to warn of such a known defect. *See Jones v. Laughlin Steel,* —— U.S. ——, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) where the Supreme court, citing *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549–50, 80 S.Ct. 926, 932–33, 4 L.Ed.2d 941 (1960) indicates

---

**5.** The issue of unseaworthiness was not involved in the appeal to the Supreme Court.

**6.** *See also Gutierrez v. Waterman, supra,* where vessel accepted torn bags of beans. When discharged, the bean sacks broke and beans were scattered on the pier. Plaintiff slipped and fell injuring himself. The Supreme court upheld the finding of unseaworthiness, stating "[A] ship

that leaks is unseaworthy; so is a cargo container that leaks. When the shipowner accepts cargo in a faulty container or allows the container to become faulty, he assumes the responsibility for injury that this may cause to seamen or their substitutes on or about the ship." *Id.* 373 U.S. at 213–14, 83 S.Ct. at 1189–90.

the availability of a negligence remedy for an injured longshoreman against the vessel owner under pre-1978 amendment law, "even if the [unseaworthy] condition was not attributable to negligence by the owner." 103 S.Ct. 2547 n. 7 action under the general maritime law.

In *Harrison v. Flota Mercante Grancolombiana,* 577 F.2d 968 (5th Cir.1978), the court in applying pre-1972 amendment law found the vessel unseaworthy when barrels of liquid chemical isobutyl acrylate (IBA) cargo with defective warning labels were ruptured while being loaded. When the load was lifted, the winch slipped. Two barrels fell and hit a third, rupturing all three. Plaintiff assisted cleaning up the IBA that spilled in the hold. As a result of his exposure to the fumes and the liquid, plaintiff over a period of time became totally disabled and now suffers from diffuse pulmonary fibrosis and emphysema. The dangers of exposure to IBA were generally known at the time of the accident. The label on the barrels did not have an adequate warning of the dangers of IBA. The package was therefore defective. The vessel was rendered unseaworthy because of the packaging defect.[7]

The case at bar is most analogous to *Morales v. City of Galveston, supra.* In that case grain was being loaded in bulk.[8]

The last shot of grain was improperly fumigated and Morales, a longshoreman, was injured by fumes when the grain was released into the bin. Evidence adduced at trial showed that the grain was copiously tested by the elevator, under government authority, when the grain was received and disbursed. These tests failed to detect the remaining noxious chemicals.

The vessel was found to be seaworthy as "the cause of injury was not any defect in the ship but the fact that the last shot of grain which was being loaded was contaminated." *Morales v. City of Galveston,* 291 F.2d 97, 98 (5th Cir.1961). Although the plaintiff argued that the vessel was unseaworthy for failure to equip the cargo spaces with forced ventilation, the Supreme Court upheld the seaworthiness and pointed out that the injury was solely caused by "the isolated and completely unforeseeable introduction of a noxious agent from without." 370 U.S. at 171, 82 S.Ct. at 1230.[9] The dissenting justices disputed the unforeseeability of the accident as three or four similar accidents occurred in Galveston between 1949 and 1953. *Id.* at 171–72, 82 S.Ct. at 1230–31.

▮ In the case at bar, plaintiff's injury was caused by the dangerous nature of the asbestos cargo. Asbestos cargo, like

---

7. Although the vessel was unseaworthy, the district court assessed liability solely against the defendant manufacturer because it found that neither the vessel nor the stevedore was actively negligent and that the active negligence of the manufacturer was the cause of plaintiff's injury. The court of appeals held that the finding of the trial court that the stevedore was not actively negligent was clearly erroneous and remanded the case for further findings.
*See Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457 (5th Cir.1976). Martinez was injured by benzine fumes while attempting to strip the tanks of a barge. During trial the court indicated that the barge was unseaworthy "because of the negligent manner in which the stripping was conducted and because of the failure to provide adequate warning of the nature of cargo." *Id.* at 467. The Fifth Circuit noted that, "[W]e do not regard DuPont's alleged failure to warn as a source of the barge's unseaworthiness." *Id. See also Gutierrez v. Waterman, supra.*

8. As noted by the Supreme Court in *Gutierrez v. Waterman,* "Morales, of course, did not involve

the unseaworthiness of cargo containers, but rather that of the ship's hold." *Id.* 373 U.S. at 213 n. 4, 83 S.Ct. at 1190 n. 4.

9. The district court reasoned that,
> ... While the Grelmarion's cargo spaces were not equipped with forced ventilation systems, I find that only very rarely is this the case on grain vessels, and that it is not necessary or customary....
> The finding heretofore has been made that the noxious gases and fumes were introduced into the bin with the last 'shot' of grain, and resulted from a fumigant that had been improperly applied, and that had adhered to the grain an unusually long period of time. Under these circumstances, I find that the admission thereof into the bin of the vessel did not cause the Grelmarion to become unseaworthy, the vessel and all its appurtenances being entirely adequate and suitable in every respect. 181 F.Supp. 202 at 206, 207.

grain, corn, flour and other commodities, was shipped in burlap sacks, in full accordance with the Coast Guard regulations. But for its unknown properties, this method of packaging was wholly adequate. Plaintiff's injury did not arise from his slipping and falling in loose asbestos, as in *Gutierrez v. Waterman S.S. Co., supra,* and *Hagans v. Ellerman & Bucknall S.S. Co.,* 318 F.2d 563 (3rd Cir.1963);[10] or from the method of stowing and unloading the cargo, as in *Hroncich v. American President Lines,* 334 F.2d 282 (3rd Cir.1964);[11] or from the lack of adequate warning of a known danger, as in *Martinez v. Dixie Carriers, supra;* but from inhaling fibers that, at the time, were not known to be toxic.

The danger emanated solely from the unknown properties of the cargo itself and not from any defect within the hull, appurtenances, or crew of the vessels. The Lykes Brothers ships that plaintiff worked aboard were seaworthy. The danger, as in *Morales,* was an unforeseeable noxious agent introduced from without.

8. Accordingly, the Court finds for the defendant and against the plaintiff.

9. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. If any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

---

**10.** Hagans slipped on sand that spilled from broken bags of cargo.

**11.** Hroncich was injured while unloading bales of rubber. The longshoremen were separating the rubber bales that were stuck together when a vertical column of the stacked bales fell. One of the bales that fell bounced and struck plaintiff.